















JPP   6/9/03   13:50
3:03-CV-01146   SAN DIEGO UNIFIED V. TDY INDUSTRIES INC
*1*
*CMP.*

1  Douglas M. Butz, Esq. (SBN 060722)
   Paul J. Dechary, Esq. (SBN 211340)
2  Lee S. Kaminetz, Esq. (SBN 222119)
   BUTZ DUNN DESANTIS & BINGHAM
3  A PROFESSIONAL CORPORATION
   ATTORNEYS AT LAW
4  101 West Broadway, Suite 1700
   San Diego, California 92101-8289
5  (619) 233-4777 / Facsimile (619) 231-0341

6  Attorneys for Plaintiff
   SAN DIEGO UNIFIED PORT DISTRICT

7

8

9



10            UNITED STATES DISTRICT COURT

11       FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12

13  SAN DIEGO UNIFIED PORT DISTRICT,        CASE NO.
                                            '03 CV 1146 H    POR
14            Plaintiff,
                                            COMPLAINT
15  v.

16  TDY INDUSTRIES, INC.; RYAN
    AERONAUTICAL COMPANY; TELEDYNE          [JURY TRIAL DEMANDED]
17  RYAN COMPANY; TELEDYNE RYAN
    AERONAUTICAL COMPANY; TELEDYNE
18  INDUSTRIES, INC.; ALLEGHENY
    TELEDYNE, INC.; ALLEGHENY
19  TECHNOLOGIES, INC.; and DOES 1 through
    10, inclusive,
20
              Defendants.
21

22

23       Plaintiff San Diego Unified Port District (the "Port"), a governmental entity, alleges as

24  follows:

25                         __INTRODUCTION__

26       1.      This is an action brought by the Port under the Comprehensive Environmental

27  Response, Compensation, and Liability Act ("CERCLA"), as amended, 42 U.S.C. § 9601, *et seq.*,

28  the Carpenter-Presley-Tanner California Hazardous Substances Account Act, as amended, Cal.

BUTZ DUNN DESANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

ORIGINAL

1   Health & Safety Code § 25300, *et seq.*, the Porter-Cologne Water Quality Control Act, as

2   amended, Cal. Water Code § 13000, *et seq.*, and various common law theories of tort liability.

3       2.      Defendants are former tenants and operators, or the corporate parents, assignees, or

4   successors-in-interest of such former tenants and operators, of the Teledyne Ryan Aeronautical

5   Facility ("TRA Facility" or "Site") located in the City of San Diego, California. The TRA Facility

6   is comprised of approximately 44 acres where Defendants have at various times conducted

7   aeronautical manufacturing operations since approximately 1939.   During those years of

8   operations, Defendants used a variety of chemicals and other hazardous materials at the Site,

9   including chlorinated and aromatic volatile organic chemicals ("VOCs") used primarily for

10  cleaning aviation parts and equipment; adhesives and resins, sealants, inks, paints, mineral acids,

11  caustic solutions, and other inorganic chemicals associated with metal finishing processes; and

12  petroleum products used for fuel, lubrication, and other purposes.   Some of these chemicals,

13  possibly including paints, dielectric fluids (e.g., transformers, capacitors), hydraulic fluids, heat

14  transfer fluids, plasticizers, adhesives, sealants, inks, and cutting oils, may have contained PCBs.

15      3.      The manufacturing and related activities of the Defendants at the TRA Facility have

16  resulted in widespread, historical contamination at the site.  Preliminary investigations suggest that

17  VOCs and their hazardous breakdown products may have impacted local groundwater resources

18  that connect hydrologically to the environmentally sensitive San Diego Bay.   Heavy metals,

19  including hexavalent chromium (a known carcinogen), are likely to be dispersed in soils at the Site.

20  Toxic PCBs from sources at the Site appear likely to continue to contribute to the presence of

21  contamination in local sewage and storm water drainage systems.   These releases of hazardous

22  substances all present a real and ongoing threat to human health and the environment.

23      4.      Various regulatory agencies, including the San Diego Regional Water Quality

24  Control Board ("Regional Board"), the California Department of Toxic Substances Control

25  ("DTSC"), and the County of San Diego Department of Environmental Health ("DEH"), have

26  sought to have Defendants take necessary action to respond to the environmental threat posed by

27  contamination at the TRA Facility.  Notwithstanding those efforts, Defendants have now shut

28  down their commercial activities at the Site and abandoned it, without any meaningful attempt to

BUTZ DUNN DESANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

COMPLAINT

1   adequately characterize and remediate environmental conditions there.  As a result, the Port has

2   incurred and will incur necessary and substantial costs to respond to those conditions and to protect

3   human health and the environment.

4       5.      As Trustee acting for the benefit of the People of the State of California, the Port is

5   entitled to the recovery of environmental response costs it already has incurred at the TRA Facility.

6   It also is entitled to a judicial declaration that Defendants are and will remain liable for such costs

7   as the Port may incur in the future.  The Port is in all respects entitled to the recovery of the

8   damages it has incurred in its capacity as Trustee, as a consequence of Defendants' failures to

9   conduct their business operations at the TRA Facility in an environmental benign fashion.  The

10  Port has brought this action to enforce those remedies to which it is entitled as a matter of both law

11  and equity.

12

13                              **THE PARTIES**

14      6.      Plaintiff is a special governmental entity created in 1962 by an act of the California

15  Legislature, known as the San Diego Unified Port District Act, 1962 Cal. Stat., ch. 76, Ist Ex.

16  Sess., 362, §1 (codified as amended at Cal. Harb. & Nav. Code App. I) ("Port Act").  The Port was

17  created to advance the State's policy of developing the harbors and ports of the State for "multiple

18  use for the benefit of the people."  Port Act § 4.  The Port has been directed by the State

19  Legislature to use its powers and authorities to "protect, preserve, and enhance" physical access to

20  San Diego Bay, the natural resources of the Bay (including plant and animal life), and the quality

21  of the waters of the Bay.  Port Act § 4.  The Port has the authority to sue and be sued (Port Act §

22  23), to purchase, lease, hold, and sell real property (Port Act § 25), and to make contracts (Port Act

23  § 31).  The Port's headquarters are located in the City and County of San Diego, California.

24      7.      Plaintiff is informed and believes, and on that basis alleges, that Defendant Ryan

25  Aeronautical Company ("Ryan Aeronautical" or "RAC") was organized and existed as a California

26  corporation beginning in the 1930's.  It was merged with and into Ryan Aeronautical Company, a

27  Delaware corporation, on or about February 18, 1969.  At all times relevant to this Complaint,

28  Ryan Aeronautical was doing business in the City and County of San Diego, California.  All

BUTZ DUNN DESANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

                                3

                                                        COMPLAINT

1  references to Ryan Aeronautical or RAC in this Complaint are to both the California and Delaware

2  corporations of the same name.

3          8.      Plaintiff is informed and believes, and on that basis alleges, that on

4  October 31, 1969, Teledyne Ryan Company ("Teledyne") acquired substantially all of the business

5  and operating assets of Ryan Aeronautical and became the successor-in-interest to Ryan

6  Aeronautical.  At all times relevant to this Complaint, Teledyne Ryan was doing business in the

7  County of San Diego, California.

8          9.      Plaintiff is informed and believes, and on that basis alleges, that Teledyne changed

9  its name to Teledyne Ryan Aeronautical Company ("TRAC") on December 12, 1969.  TRAC

10 became the successor-in-interest to Teledyne.  Plaintiff is informed and believes, and on that basis

11 alleges, that Defendant TRAC was at all times relevant to this Complaint, a corporation organized

12 and existing under the laws of the State of California and doing business in the County of San

13 Diego, California.

14         10.     Plaintiff is informed and believes, and on that basis alleges, that TRAC was merged

15 with and into Teledyne Industries, Inc. (now TDY) and became Teledyne Ryan Aeronautical, a

16 division of Teledyne Industries, Inc. (now TDY) on October 31, 1970.  As a result of these

17 transactions, Teledyne Industries, Inc. became the successor-in-interest of RAC, Teledyne and

18 TRAC.

19         11.     Plaintiff is informed and believes, and on that basis alleges, that Defendant

20 Teledyne Industries, Inc. was at all times relevant to this Complaint, a corporation organized and

21 existing under the laws of the State of California and doing business in the County of San Diego,

22 California.  Plaintiff is informed and believes, and on that basis alleges, that Teledyne Industries,

23 Inc., changed its name to TDY Industries, Inc. ("TDY") on or about December 1999.  TDY is the

24 successor-in-interest to RAC, Teledyne, TRAC and Teledyne Industries, Inc.

25         12.     Plaintiff is informed and believes, and on that basis alleges, that Defendant TDY is,

26 and at all times relevant to this Complaint was, a corporation organized and existing under the laws

27 of the State of California and doing business in the County of San Diego, California.  Plaintiff is

28

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

4

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

1   informed and believes, and on that basis alleges, that Defendant TDY's current headquarters is

2   located in Pittsburgh, Pennsylvania.

3         13.    Plaintiff is informed and believes, and on that basis alleges, in 1996, Allegheny

4   Teledyne Incorporated was created through the merger of Allegheny Ludlum Corporation and

5   Teledyne, Inc.   Plaintiff is informed and believes, and on that basis alleges that Defendant

6   Allegheny Technologies, Inc. was created through the reorganization of Allegheny Teledyne

7   Incorporated (collectively "Allegheny").  Allegheny Technologies, Inc. is the successor-in-interest

8   to Allegheny Teledyne Incorporated.

9         14.    Plaintiff is informed and believes, and on that basis alleges, that Defendant

10  Allegheny is, and at all times relevant to this Complaint was, a corporation organized and existing

11  under the laws of the State of Delaware and doing business in the County of San Diego, California,

12  with its principal place of business in Pittsburgh, Pennsylvania.  Allegheny is, and at all times

13  relevant to this Complaint, has been the parent corporation of TDY (formerly Teledyne Industries,

14  Inc.), acting through Allegheny's wholly-owned subsidiary, TDY Holdings LLC.

15        15.    There exists, and at all time herein mentioned there existed, a unity of interest and

16  ownership between Defendants Allegheny and TDY such that any separateness between Allegheny

17  and TDY has ceased and Allegheny is the alter ego of Defendant TDY in that Allegheny controlled

18  and dominated the corporate business of TDY.

19        16.    Adherence to the fiction of the separate existence of the Defendant Allegheny as an

20  entity distinct from Defendant TDY would promote injustice in that Allegheny would avoid

21  liability for the contamination it caused at the Site.

22        17.    The Port does not know the true names or capacities of Cross-Defendants named in

23  this action as DOES 1 through 10, inclusive, and sues those DOE Defendants.   The Port is

24  informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is

25  responsible in some way for the occurrences alleged in this Complaint. The Port will amend this

26  Complaint to show the true names and capacities of those Defendants when they have been

27  ascertained.

28  ///

---

5

COMPLAINT

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the federal claims alleged in this case pursuant to 42 U.S.C. §§ 9613(b), and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the related state statutory and common law claims alleged in this case pursuant to 28 U.S.C. § 1367, insofar as those claims arise out of the same transactions and occurrences as the federal claims.

19.     Venue is proper in this judicial district pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391, because the causes of action alleged in this Complaint involve releases or threatened releases or damages that have occurred in connection with real property located in San Diego, California, within this judicial district.

## GENERAL ALLEGATIONS

20.     On or about April 7, 1939 (the "Occupancy Date"), the City of San Diego, a municipal corporation, first entered into a long-term lease with Ryan Aeronautical, as lessee, for approximately 10 acres of property located at 2701 North Harbor Drive in San Diego, California. The original 10-acre parcel was in the northeastern part of what is now the TRA Facility.

21.     Plaintiff is informed and believes, and on that basis alleges, that Ryan Aeronautical began manufacturing and related research and development activities at the TRA Facility at or about the same time it originally entered into its lease with the City of San Diego in 1939. By 1943, the leasehold property had expanded to approximately 38 acres, and by 1955, it had expanded to approximately 44 acres. In addition, numerous buildings and other fixtures have been constructed at the TRA Facility in order to accommodate the manufacturing and related operations conducted there.

22.     In 1962, the real property comprising the TRA Facility was transferred to the Port to be held in trust for the People of the State of California. As a result, the Port was substituted for the City of San Diego as the lessor of the property. At no time material to this Complaint, however, has the Port itself conducted any manufacturing or other commercial operations at the TRA Facility. In particular, the Port has at no time ever undertaken any business activities at the

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

6

1   TRA Facility that caused or contributed to the release or threatened release of hazardous or toxic

2   substances or materials there.

3       23.    The entire business operations at the TRA Facility were transferred by Ryan

4   Aeronautical in 1969 to Teledyne Ryan and then to Teledyne Industries, Inc., which now is known

5   as TDY.  TDY continued those business operations without material change through 1999.  During

6   the approximately 60 years of ongoing business operations at the TRA Facility, these Defendants

7   manufactured a variety of different aeronautical parts and equipment, including aircraft, aircraft

8   and helicopter parts, target drones, and unmanned air reconnaissance vehicles.

9       24.    As part of their continuing business operations at the Site, Defendants employed a

10  variety of different manufacturing and chemical processes, including explosives formation, engine

11  testing, general manufacturing, painting, chemical and hazardous waste storage, photo and x-ray

12  processing, chrome plating and anodizing, solvent degreasing and parts cleaning, sanding and bead

13  blasting, welding, chemical mixing and dispensing, metal cutting and processing, and equipment

14  maintenance.  Defendants also used a variety of different chemicals and other hazardous materials,

15  including chlorinated solvents, adhesives, resins, sealants, inks, paints, mineral acids, caustic

16  solutions, petroleum products, dielectric fluids, hydraulic fluids, heat transfer fluids, plasticizers,

17  adhesives, sealants, and cutting oils.

18      25.    In the fall of 1984, Teledyne Industries, Inc., as successor-in-interest to Ryan

19  Aeronautical Company, and acting through its Teledyne Ryan Aeronautical Division, surrendered

20  the 1939 lease.  (*See* **Exhibit "A."**)  Although Teledyne Industries, Inc. surrendered the 1939 lease,

21  actual possession of the Site was not tendered to the Port at that time.

22      26.    In the fall of 1984, the Port and Teledyne Industries, Inc. (now TDY), acting by and

23  through its Teledyne Ryan Aeronautical Division ("TRA"), entered into a lease (the "Lease") for

24  the TRA Facility.  (A true and accurate copy of the Lease is attached hereto as **Exhibit "B"**).

25  Pursuant to its terms, the Lease was effective from October 1, 1984, through March 31, 1989, with

26  seven 5-year option periods.  The first three options were exercisable at TDY's discretion, and

27  TDY exercised those options.

28  / / /

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

7

COMPLAINT

1       27.    In the fall of 1996, TDY and the Port entered into an Agreement for Amendment of

2   Lease (the "Amendment") that, among other things, redefined the description of the Site and

3   amended the rental provisions of the Lease.  (A true and accurate copy of the Amendment is

4   attached hereto as **Exhibit "C"**).  Except for those specific provisions expressly amended in the

5   Amendment, all terms, covenants and conditions of the Lease remained in full force and effect.

6       28.    In the fall of 1998, the Port and TDY, acting through TRA, entered into a Tideland

7   Use and Occupancy Permit (the "TUOP").  (A true and accurate copy of the TUOP is attached

8   hereto as **Exhibit "D"**).  Among other things, the TUOP granted TDY the right to use and occupy

9   certain property (the "Parking Property") more particularly described as follows:

> Approximately 138 parking spaces adjacent to 2701 North Harbor Drive
> located on District Tidelands in the City of San Diego, California, more
> particularly delineated on Drawing No. 007-032, revised August 27, 1996.

13   A copy of Drawing No. 007-032 is attached to the TUOP.  Upon information and belief, TDY first

14   occupied the Parking Property in April, 1972 and continued to occupy the Parking Property

15   through successive occupancy permits up to and including the TUOP.   (All further references to

16   the Site in this Complaint shall be understood to include the Parking Property.)

17       29.    On or about October 31, 2002, TDY expressly abandoned possession of the Site.  (A

18   true and accurate copy of TDY's notice of abandonment is attached hereto as **Exhibit "E"**).  Only

19   after this abandonment of the Site by TDY did the Port come to actually possess the Site for the

20   first time.  Shortly after it regained possession of the Site from TDY, the Port began to investigate

21   its environmental condition, and became aware of certain environmental conditions at the Site.

22       30.    Plaintiff is informed and believes, and on that basis alleges, that during the

23   approximately 60 year period during which Defendants collectively operated at the TRA Facility,

24   there have been numerous disposals and releases or threatened releases of hazardous substances

25   and other hazardous and toxic materials at the TRA Facility. Portions of the Site impacted by

26   historical releases and threatened releases of hazardous materials include, without limitation, the

27   following:

28

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

COMPLAINT

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

(a)   **Area D.**  Area D is in the northwestern portion of the Site and is the location of several former underground storage tanks ("USTs").  These tanks, which reportedly were installed in 1956, 1965, and 1970, and eventually removed in approximately 1986, were used to store mixed solvents and jet fuel. Elevated concentrations of benzene, naphthalene, methyl-tertiary butyl ether ("MTBE") and vinyl chloride, as well as chlorinated solvents, have been detected in groundwater in this area.

(b)   **Building 102 Area.**  Building 102 is located in the south-central portion of the Site.  A 1,100-gallon diesel UST reportedly was installed in this area in 1942, taken out of service in 1962, and emptied in 1989.  In addition to residual petroleum hydrocarbons, elevated concentrations of vinyl chloride, cis-1,2-dichlolroethene, MTBE, and bis-2-ethylexly phthalate ("BEHP") have been detected in groundwater in the area.

(c)   **Building 120 Former Maintenance Pit.**  Building 120 is a large structure located in the central portion of the Site, and it was one of the principal buildings used for historical manufacturing operations there.  A subsurface concrete vault and associated maintenance pit is reported to have existed previously in the eastern portion of the building.  Elevated concentrations of tetrachloroethene ("PCE") and trichloroethene ("TCE") have been documented in both soils and groundwater at and in the vicinity of this area.

(d)   **Building 120 – East Storm Drain Area.**  A 30-inch storm drain was reportedly located east and continued south of Building 120.  Elevated concentrations of PCB and PCE have been detected in soils in the vicinity of the storm drain.

(e)   **Building 158 – Chromic Acid Tank.**  Building 158 is located in the northwest portion of the Site.  Various chromic acid dip tanks and wash down tanks reportedly were located within the building and supported the preparation of parts during manufacturing operations (including anodixing

9

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

and aldining processes) at the TRA Facility.  Elevated concentrations of hexavalent chromium have been detected in groundwater downgradient of these tanks.

(f)  **Building 130.**  Building 130 is located along the northern property line of the TRA Facility.  A release of 1,1,1-trichloroethane ("1,1,1-TCA") was reported to have occurred on the north side of this building in 1992.

(g)  **Building 120 – Photochemical Pit.**  Elevated concentrations of TCA reportedly have been detected in soils near a former photochemical pit in Building 120.

(h)  **Miscellaneous Petroleum USTs.**  USTs containing petroleum products were formerly located throughout the TRA Facility.  While they now have been removed from the Site, residual hydrocarbon contamination has been detected in soils in the vicinity of one or more of these former USTs, including one former UST located near Building 157 in the northwestern corner of the Site.

31.  The historical disposal and release of hazardous substances and materials at the TRA Facility have resulted in widespread contamination of the Site and present a continuing, substantial and imminent threat to human health and the environment.  These conditions are the direct and proximate result of Defendants' failure to operate the TRA Facility in an environmentally appropriate and responsible manner.  Defendants have received numerous notices of violation ("NOVs") from regulatory agencies having jurisdiction over the Site, including DEH, citing failures ranging from administrative violations (such as failure to properly label hazardous materials containers) to unauthorized discharge of waste.   Defendants also have failed to properly close former hazardous waste storage areas located at the Site in accordance with applicable hazardous waste facility requirements administered by the DTSC.

32.  In response to the presence of hazardous substances and contamination at the TRA Facility, and the resulting threat presented to the environment, the Port has incurred and will continue to incur substantial costs as Trustee of the Site for the State of California.  Among other

COMPLAINT

things, the Port has been required to respond to formal requests from the Regional Board under California Water Code § 13267, seeking information and reports regarding potential sources of PCB contamination at and from the TRA Facility. The Port is undertaking preliminary Site-wide investigations of environmental conditions at the TRA Facility, and it expects to continue and expand its response actions consistent with further requirements of the Regional Board and other agencies.

## FIRST CAUSE OF ACTION

### *(Cost Recovery and Contribution under CERCLA Sections 107 and 113)*

33.    The Port incorporates the allegations of Paragraphs 1 through 32 by reference.

34.    The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

35.    The Port is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

36.    Each of the Defendants is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

37.    Chemicals, chemical wastes, and other materials that have been disposed of or otherwise deposited on or at the Site, including but not limited to PCBs, PCE, TCE, toluene, chromium and/or chromic acid, are "hazardous substances" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

38.    Defendants, and each of them, are or were an "owner or operator" of the Site, within the meaning of Section 101(20)A of CERCLA, 42 U.S.C. § 9601(20)A, at the time hazardous substances were disposed of at the Site.

39.    There has been a "release or a threat of release" of hazardous substances to the "environment," within the meaning of Sections 101(22), 101(8), and 107(a) of CERCLA, 42 U.S.C. § 9601(22), 9601(8), and 9607(a).

40.    The Port has incurred and will incur substantial costs of responding to the release or threat of release of hazardous substances at the Site, and those costs have been and will be

11

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

1  necessary costs of response consistent with the National Contingency Plan ("NCP"), within the

2  meaning of Sections 105 and 107(a) of CERCLA, 42 U.S.C. § 9605 and 9607(a).

3      41.    Defendants, and each of them, are liable parties with respect to the Port's necessary

4  costs of responding to the release or threat of release of hazardous substances at the Site under

5  Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

6      42.    Defendants, and each of them, are jointly and severally liable to the Port with

7  respect to the Port's necessary response costs under Section 107(a) of CERCLA, 42 U.S.C. §

8  9607(a).

9      43.    The Port is entitled to full and complete contribution from Defendants, and each of

10  them, for its necessary costs of responding to the release or threat of release of hazardous

11  substances at the Site, pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), together with

12  interest and costs.

13

14                      **SECOND CAUSE OF ACTION**

15                      *(California Water Code Section 13304(c))*

16      44.    The Port incorporates the allegations of Paragraphs 1 through 43 by reference.

17      45.    The Port is a governmental agency which has incurred, and will continue to incur,

18  costs in accordance with California Water Code Section 13304(c) to clean up, abate the effects of,

19  and remediate the unauthorized discharges and threatened discharges of waste caused or permitted

20  by Defendants into waters of the State, and conditions of pollution and nuisance caused by

21  Defendants.

22      46.    Pursuant to Water Code Section 13304(c), Defendants are statutorily liable to the

23  Port for all costs of cleanup, abatement, and remediation, including the supervision of Defendants'

24  past cleanup and abatement activities.

25      47.    The Port is therefore entitled to recover from Defendants, and each of them, all costs

26  of cleanup, abatement, and remediation in the areas at the Site specified above under California

27  Water Code Section 13304(c).

28  / / /

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

12

COMPLAINT

1

### THIRD CAUSE OF ACTION

2

*(Contribution and/or Indemnity under California Health & Safety Code § 25.00 et seq.)*

3      48.    The Port incorporates the allegations of Paragraphs 1 through 47 by reference.

4      49.    California Health & Safety Code Section 25363(e) provides:

5              Any person, who has incurred removal or remedial action costs in
               accordance with this chapter or the federal act may seek contribution or
6              indemnity from any person who is liable pursuant to this chapter...An
               action to enforce a claim may be brought as a...separate action after the
7              person seeking contribution or indemnity has paid removal or remedial
               action costs in accordance with this chapter or the federal act.
8

9      50.    The Port is informed and believes, and on that basis alleges, that Defendants are

10   "liable persons" as defined by California Health & Safety Code § 25323.5(a)(1) and are thereby

11   liable in contribution and/or indemnity for response costs pursuant to Health & Safety Code §

12   25363(e).

13     51.    The Port did not cause or contribute to the release of hazardous substances on,

14   under, or near the Site.  However, in the interest of an expeditious cleanup and acting in good faith

15   and in the public interest, Plaintiff has incurred, and it will incur costs necessary to respond to the

16   release or threatened release of hazardous substances from the Site, consistent with the NCP and in

17   accordance with the California Hazardous Substances Account Act, in an amount to be proved at

18   trial.

19     52.    Defendants, and each of them, are liable to Plaintiff for contribution and/or

20   indemnity under California Health & Safety Code §§ 25363(e) and 25323.5 for some or all

21   amounts that Plaintiff has incurred and may incur in the future as the result of the release or

22   threatened release of hazardous substances from the Site.

23     53.    Plaintiff has given written notice to the director of the Department of Toxic

24   Substances Control, as required by California Health & Safety Code § 25363(e).

25

26             ### FOURTH CAUSE OF ACTION

27             *(Public Nuisance: California Civil Code Sections 3479-3480)*

28     54.    The Port incorporates the allegations of Paragraphs 1 through 53 by reference.

13

COMPLAINT

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

55.     All ground water within the State of California, including the ground water underlying the Site and adjacent areas, constitutes "waters of the state" pursuant to Section 13050(e) of the California Water Code and is held in trust for the public by the State of California.

56.     In the areas identified above, the pollutants and contaminants released by Defendants into the ground water, and the pollutants and contaminants released by Defendants into the soil which threaten to be released into the ground water, constitute a public nuisance because these pollutants and contaminants have migrated into the environment, are injurious to health and offensive to the senses, and continue to damage the public's right to clean and uncontaminated natural resources of the State of California. The nuisance is continuing and abatable.

57.     The nuisance is a public nuisance because it affects a public right and an entire community consisting of a considerable number of persons. At the same time, it causes special injury to the Port because much of the soil contamination is located on, and a substantial amount of the groundwater contamination underlies, the Site and because other governmental agencies have looked to the Port, among others, to clean it up.

58.     Any liability and potential liability faced by the Port due to Defendants' pollution and contamination of the Site are the direct and proximate result of the improper management, use, storage, disposal, and release by Defendants of pollutants and contaminants at the Site, which resulted in contamination of soil and ground water.

59.     Defendants' management, use, storage, disposal, and release of pollutants and contaminants at the Site gave rise to a duty on the part of Defendants to remedy the hazardous conditions created by their conduct. Defendants have failed to remedy those conditions.

60.     Defendants have failed and continue to fail to recognize their obligation to assume responsibility for the cleanup of their pollutants and contaminants at the Site.

61.     The Port has given notice to Defendants of the damage caused by the nuisance, and requested its abatement, but Defendants have refused and continue to refuse to abate the nuisance or to compensate the Port for damages suffered.

/ / /

/ / /

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

14

1  62.    As a direct and proximate result of the nuisance created by Defendants, and each of

2  them, the Port has been and will be damaged by incurring costs to investigate and respond to the

3  releases of pollutants and contaminants at the Site.

4  63.    Therefore, pursuant to Cal. Civ. Proc. Code § 731, the Port is entitled to an award of

5  damages in accordance with proof at trial and an order requiring Defendants to abate the nuisance

6  in accordance with all applicable laws, regulations, and orders.

7

8  **FIFTH CAUSE OF ACTION**

9  *(Private Nuisance: California Civil Code Sections 3479-3481)*

10  64.    The Port incorporates the allegations of Paragraphs 1 through 63 by reference.

11  65.    During the time that Defendants, and each of them, have leased, been in possession

12  of, and operated at the areas at the Site identified above, they have leased, used, occupied,

13  operated, and maintained them in a manner that allowed pollutants and contaminants to be released

14  onto and from the Site and into soils and waters of the State of California.  These pollutants and

15  contaminants are injurious to health and offensive to the senses.

16  66.    The release of pollutants and contaminants at the areas of the Site has interfered and

17  will continue to interfere with the Port's comfortable enjoyment and free use of the Site.

18  67.    Because the Port is the trustee of the Site, the release of pollutants and contaminants

19  has diminished the value of the Site and thus injured its economic value to the Port as trustee.

20  68.    Defendants' use, occupation, operation, and maintenance of the Site, and their

21  failure to remediate pollution and contamination caused thereby, constitute a nuisance within the

22  meaning of Section 3479 of the California Civil Code, which nuisance is continuing and abatable.

23  69.    The Port has given notice to Defendants of the damage caused by the nuisance, and

24  requested its abatement, but Defendants have refused, and continue to refuse, to abate the nuisance

25  and to compensate the Port for damages suffered.

26  70.    As a direct and proximate result of the nuisance created by Defendants, and each of

27  them, the Port has been and will be damaged by incurring costs to investigate, respond to, and

28  clean up the releases of pollutants and contaminants at and from the Site.

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

15

COMPLAINT

71.     Therefore, pursuant to Cal. Civ. Proc. Code § 731, the Port is entitled to an award of damages in accordance with proof at trial and an order requiring Defendants to abate the nuisance in accordance with all applicable laws, regulations, and orders.

## SIXTH CAUSE OF ACTION

### *(Nuisance Per Se)*

72.     The Port incorporates the allegations of Paragraphs 1 through 71 by reference.

73.     In their occupancy, operation, and maintenance of the Site, Defendants have discharged wastes in violation of Cal. Water Code §§ 13260-13261, and Cal. Health & Safety Code § 5411. Each of these violations constitutes a nuisance per se.

74.     Therefore, pursuant to Cal. Civ. Proc. Code § 731, the Port is entitled to an award of damages in accordance with proof at trial and an order requiring Defendants to abate the nuisance in accordance with all applicable laws, regulations, and orders.

## SEVENTH CAUSE OF ACTION

### *(Waste)*

75.     The Port incorporates the allegations of Paragraphs 1 through 74 by reference.

76.     As tenants of the Port, Defendants in their use of property held in trust by the Port have harmed the Port's interest in the Site by means of the wrongful deposit of pollutants and contaminants at, under, and on the Site.

77.     As a direct and proximate result of the harm caused by Defendants, and each of them, the value of the Site has been significantly depreciated.

78.     The Port is entitled, under Cal. Civ. Proc. Code § 732, to a judgment for treble damages to be established at trial, and an order enjoining Defendants from committing the waste.

## EIGHTH CAUSE OF ACTION

### *(Trespass)*

79.     The Port incorporates the allegations of Paragraphs 1 through 78 by reference.

16

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

80.     Defendants have interfered with the Port's right to free and clear possession of the Site, by wrongfully depositing pollutants and contaminants at, under, or on the Site and by failing and refusing to remove the pollutants and contaminants or to finance their removal.

81.     The continuing migration of the hazardous substances alleged above constitutes a wrongful entry onto the Site.

82.     The Port therefore is entitled to an award of damages and an order requiring Defendants to remedy the conditions constituting the trespass in accordance with all applicable laws, regulations, and orders.

## NINTH CAUSE OF ACTION

### *(Negligence Per Se)*

83.     The Port incorporates the allegations of Paragraphs 1 through 82 by reference.

84.     Pursuant to the laws of the State of California, the Defendants, and each of them, operate and have operated under various legal duties intended to prevent each from causing injury or damage to real property and various protected waters of the State of California by the improper and unlawful deposit, disposal, dumping, dispersal, or release of various pollutants and contaminants upon the real property that each Defendant occupies or occupied at the Site.

85.     The various legal duties that Defendants, and each of them, were obligated to fulfill include, but are not limited to, the following statutes and regulations:

a.     California Water Code §§ 13260 and 13261, which prohibit the discharge of wastes without filing a report with the appropriate Regional Board, and

b.     California Health and Safety Code § 5411, which provides in full:

> No person shall discharge sewage or other waste, or the effluent of treated sewage or other waste, in any manner which will result in contamination, pollution or a nuisance.

86.     The Port is informed and believes, and upon that basis herein alleges, that the Defendants, and each of them, have engaged in various acts and omissions in direct violation of one or more duties mandated by the statutes cited above, resulting in the deposit, release, and disposal

BUTZ DUNN DESANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

17

COMPLAINT

1   of the pollutants and contaminants found in the surface soil, sub-surface soil, and ground water at

2   the Site.

3        87.    As a direct, proximate, and legal result of the violation of each said statute and

4   regulation by the Defendants, and each of them, the Port has been forced to investigate and

5   remediate the source and extent of the contamination and pollution found within the soil and

6   ground water at the Site and, as a result, has incurred various costs and expenses and thus has

7   sustained actual and future economic injury, and will continue to suffer such additional injury as

8   such further costs are incurred to remove and clean up all such contamination and pollution found

9   within the soil and ground water at the Site.

10       88.    The nature of the injuries the Port has sustained, and shall hereafter sustain, caused

11  by the unlawful acts and omissions of the Defendants, and each of them, is of the type that each

12  statute and regulation cited above was designed and enacted to prevent.

13       89.    As a governmental agency entitled and obligated to protect the public health, and as

14  an entity subject to the jurisdiction of other state and federal agencies empowered and authorized to

15  protect the ground waters and other resources of the State of California, the Port is within the class

16  of entities for whose protection each of the regulations and statutes was enacted.

17       90.    Accordingly, as a direct, proximate, and legal result of the acts and omissions of the

18  Defendants, and each of them, which resulted in one or more violations of law, each said Defendant

19  should be found negligent as a matter of law pursuant to California Evidence Code § 669, and the

20  Port is entitled to recover its general, special, and consequential economic damages as hereinafter

21  prayed for.

22

23                          **TENTH CAUSE OF ACTION**

24                              *(Negligence)*

25       91.    The Port incorporates the allegations of Paragraphs 1 through 90 by reference.

26       92.    In their occupancy and operation of the Site, Defendants owed the Port the duty to

27  use, store, generate, and dispose of pollutants and contaminants in such a manner as not to cause

28  the Port to sustain damages or losses of any nature or kind.

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

COMPLAINT

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

93.     Defendants, and each of them, have breached their duty to the Port by failing to exercise reasonable care in the conduct of their occupancy and operation of their Site.

94.     But for Defendants' acts or omissions resulting in the release of pollutants and contamination onto, into, and from the Site, the Port would not have suffered damages and losses making it necessary to investigate and remediate pollution and contamination caused by Defendants at, on, under, and near those areas.  Therefore, Defendants are the direct and proximate cause of these damages and losses sustained by the Port.

95.     The damages and losses sustained by the Port were caused solely by the negligence of Defendants, and each of them, without any fault of the Port contributing thereto.  Therefore, the Port is entitled to recover from Defendants the full amount of its damages and losses.

## ELEVENTH CAUSE OF ACTION

### *(Common Law Equitable Indemnity)*

96.     The Port incorporates the allegations of Paragraphs 1 through 95 by reference.

97.     By using, storing, disposing of, and arranging for the disposal of pollutants and contaminants at the Site, Defendants created conditions that were in violation of the law and applicable rules and regulations.  Defendants' improper and careless management of pollutants and contaminants created a duty to abate the hazardous conditions created by such conduct.  Defendants have failed to abate said conditions.

98.     The Port has incurred costs in responding to the hazardous conditions existing at the Site.  In so doing, the Port has discharged and continues to discharge a legal liability justly attributable to Defendants.  All costs incurred or to be incurred by the Port in remedying and abating the conditions created by Defendants at the Site identified above were and will be incurred because Defendants have refused to recognize their legal and equitable obligations.

/ / /

/ / /

/ / /

COMPLAINT

## TWELFTH CAUSE OF ACTION

*(Declaratory Judgment Under 42 U.S.C. § 2201, Cal. Health & Safety Code § 25363,*

*and Cal. Civ. Proc. Code § 1060)*

99.   The Port incorporates the allegations of Paragraphs 1 through 98 by reference.

100.   An actual controversy exists between the Port and Defendants in that the Port contends, and Defendants deny, that Defendants are liable to the Port for the remediation and cleanup of the pollution and contamination at the Site.

101.   Because the extent and magnitude of the contamination is not fully known at this time, and because contamination has not yet been fully mitigated, the Port will incur necessary response costs including but not limited to investigatory, remedial and removal expenses, attorneys' fees, and interest in the future.

102.   Pursuant to 42 U.S.C. § 9613, 28 U.S.C. § 2201, Cal. Health & Safety Code § 25363, and Cal. Civ. Proc. § 1060, the Port is entitled to a declaratory judgment establishing the liability of the Defendants, and each of them, for such response costs for the purposes of this and any subsequent action or actions to recover further response costs and the Port's damages.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment against Defendants, as follows:

1.   For a judgment directing each named Defendant to reimburse Plaintiff for all costs and damages, including attorneys' fees, that it has incurred, and will incur, for the investigation, testing, monitoring, removal, and remediation of pollutants and contaminants at and from the Site;

2.   For a judgment directing each named Defendant to abate the nuisance, waste, and trespass caused by its releases of pollutants and contaminants at the Site;

3.   For a judgment awarding Plaintiff all of its compensatory, consequential, and treble damages according to proof at trial;

/ / /

/ / /

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

COMPLAINT

4.   For a declaratory judgment that Defendants are liable for all past, present, and future costs of response and damages, including attorneys' fees, resulting from their releases and threatened releases of pollutants and contaminants at the Site;

5.   For attorneys' fees, costs of suit, and pre-judgment interest; and

6.   For such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands trial by jury.

Dated:    June 9, 2003

BUTZ DUNN DeSANTIS & BINGHAM
A Professional Corporation

By:_____
    DOUGLAS M. BUTZ
    PAUL J. DECHARY
    LEE S. KAMINETZ
    Attorneys for Plaintiff
    SAN DIEGO UNIFIED PORT DISTRICT

BUTZ DUNN DeSANTIS & BINGHAM
A PROFESSIONAL CORPORATION
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CALIFORNIA 92101
(619) 233-4777

21

COMPLAINT

EXHIBIT A

PROPERTY FILE RECORD

FILE No. ....... 84-368

ROUTE TO:

1. ACCT. VL    2. ENG. SP

RETURN AS SOON AS POSSIBLE

SAN DIEGO UNIFIED PORT DISTRICT

Document No. **17599**

Filed _____
          Office of the Clerk

## AGREEMENT FOR
## SURRENDER AND TERMINATION OF LEASE

The parties to this Agreement are the SAN DIEGO UNIFIED PORT
DISTRICT, a public corporation, (Lessor) and TELEDYNE RYAN
AERONAUTICAL, a Division of Teledyne Industries, Inc., (Lessee).

### Recitals:

Lessor, as successor in interest to the City of San Diego, a
municipal corporation, and Lessee, as successor in interest to
Ryan Aeronautical Company, are parties to that certain lease
dated April 7, 1939 by and between the City of San Diego and Ryan
Aeronautical Company, which lease is on file in the office of the
Clerk of the City of San Diego as Document No. 313100, as
modified by an Agreement for Modification of Lease dated
October 5, 1939, on file in the office of the Clerk of the City
of San Diego as Document No. 316228, as modified by an Agreement
Relating to a Lease dated September 3, 1942 on file in the office
of the Clerk of the City of San Diego as Document No. 300565, as
amended by an Amendment to Tideland Lease dated August 15, 1944
on file in the office of the Clerk of the City of San Diego as
Document No. 349694, as modified by a Supplemental Lease
Agreement dated February 3, 1949 on file in the Office of the
Clerk of the City of San Diego as Document No. 397903, as amended
by an Agreement for Amendment of Supplement Lease Amendment dated
July 14, 1955 on file in the office of the Clerk of the City of
San Diego as Document No. 517697, as amended by an Agreement for
Amendment of Supplemental Lease Amendment on file in the office
of the Clerk of the City of San Diego as Document No. 576000, as
amended by an Agreement for Amendment of lease dated November 25,
1975 on file in the office of the Clerk of Lessor as Document
No. 9193 and particularly described and delineated in Exhibits A
and B, attached hereto and by this reference made a part hereof.
The parties intend to terminate the lease by Lessee surrendering
and Lessor accepting such surrender and Lessor and Lessee
entering into a new lease covering substantially all of the
premises.

### The Parties Agree:

1.  The effective date of this Agreement shall be September 30,
1984, subject to the Lessor entering into and granting a new
lease to Teledyne Industries, Inc., acting by and through its
Teledyne Ryan Aeronautical Division for substantially all of

1

**TRIPLICATE·ORIGINAL**

the premises.  In the event a new lease is not entered into and
granted to Teledyne Industries, Inc., acting by and through its
Teledyne Ryan Aeronautical Division, this Agreement shall be null
and void and of no force or effect.

2.  Lessee surrenders the lease and Lessor accepts such surrender
on the effective date of this Agreement.  The lease shall be
fully and finally surrendered and terminated on said effective
date, subject to Paragraph 1, above.

3.  Any remaining rights, duties, or obligations of the parties
pursuant to the terms, covenants, and conditions in the lease
shall continue in full force and effect and shall not be affected
by this Agreement.  Nothing herein is intended nor shall be
construed as a waiver of any such rights or as a release of any
such duties or obligations, whether known or unknown at this time
            effective date of this Agreement.

DATED:

By

APPROVED as to form and
legality:

Port Attorney

TELEDYNE RYAN AERONAUTICAL,
a Division of Teledyne
Industries, Inc.

By
Title: C. E. McGill
Senior Vice President-Administrati

JOSEPH D. PATELLO
Port Attorney

2

PORT 001710

EXHIBIT B

SAN DIEGO UNIFIED PORT DISTRICT

Document No. __**17600**__

Filed __DEC 2 8 1984__

Office of the Clerk

*36*

*MAR 1984*

*1989*

*OCT 1 1994*

*2 1999*

*3 2004   14*

*4 2009   19*

*5 2014*

*6 2019   2*

*7 2024*

SAN DIEGO UNIFIED PORT DISTRICT

LEASE TO

TELEDYNE INDUSTRIES, INC.
ACTING BY AND THROUGH ITS
TELEDYNE RYAN AERONAUTICAL DIVISION

OF PROPERTY LOCATED AT

2701 NORTH HARBOR DRIVE
SAN DIEGO, CALIFORNIA

FOR 4 YEARS, 6 MONTHS

COMMENCING OCTOBER 1, 1984

AND ENDING MARCH 31, 1989

WITH THE OPTION TO EXTEND THIS

LEASE FOR 7 CONSECUTIVE 5-YEAR

ADDITIONAL PERIODS

486101

ORIGINAL

# TABLE OF CONTENTS

| **Paragraph/Exhibit** | | **Page Number(s)** |
|---|---|---|
| **Preamble** . . . . . . . . . . . . . . . . . . | | 1 |
| 1. | Term . . . . . . . . . . . . . . . | 1 - 2 |
| 2. | Rental . . . . . . . . . . . . . | 2 - 6 |
| 3. | Use . . . . . . . . . . . . . . | 6 |
| 4. | Construction of Improvements. . . . . | 6 - 8 |
| 5. | Access to and Use of Lindbergh Field. | 8 - 9 |
| 6. | Improvements. . . . . . . . . . . . | 9 |
| 7. | Title to Improvements . . . . . . . | 9 - 10 |
| 8. | Liens . . . . . . . . . . . . . | 10 - 11 |
| 9. | Lease Encumbrance . . . . . . . . . | 11 |
| 10. | Assignment - Sublease . . . . . . . | 11 - 14 |
| 11. | Default . . . . . . . . . . . . . | 14 - 15 |
| 12. | Bankruptcy. . . . . . . . . . . . | 15 |
| 13. | Eminent Domain. . . . . . . . . . . | 15 |
| 14. | Supersedure . . . . . . . . . . . | 15 |
| 15. | Use Obligation. . . . . . . . . . | 16 |
| 16. | Maintenance and Repair. . . . . . . | 16 |
| 17. | Performance Bond. . . . . . . . . . | 16 |
| 18. | Taxes and Utilities . . . . . . . . | 17 |
| 19. | Conformance with Rules and Regulations . . . . . . . . . . | 17 |
| 20. | Non-Discrimination. . . . . . . . . | 17 |
| 21. | Partial Invalidity. . . . . . . . . | 18 |
| 22. | Hold Harmless . . . . . . . . . . . | 18 |
| 23. | Successors in Interest. . . . . . . | 18 |
| 24. | Easements . . . . . . . . . . . . | 18 |

17600

25.   Title of Lessor . . . . . . . . . .          18

26.   Insurance . . . . . . . . . . . . .          18 - 21

27.   Policy of Lessor. . . . . . . . . .          21

28.   Warranties-Guarantees-Covenants . . .        21

29.   Damage to or Destruction of
         Premises. . . . . . . . . . . . .          21

30.   Quitclaim of Lessee's Interest
         Upon Termination. . . . . . . . .          21 - 22

31.   Peaceable Surrender . . . . . . . .          22

32.   Waiver. . . . . . . . . . . . . . .          22

33.   Hold Over . . . . . . . . . . . . .          22

34.   Section Headings. . . . . . . . . .          23

35.   Entire Understanding. . . . . . . .          23

36.   Time is of the Essence. . . . . . .          23

37.   Attorney's Fees . . . . . . . . . .          23

38.   Notices . . . . . . . . . . . . . .          23 - 24

39.   Removal of Materials. . . . . . . .          24

40.   Equal Employment Opportunity. . . . .        24 - 25

41.   Acknowledgment of Lessor's
         Improvements. . . . . . . . . . .          25

42.   Abstract of Lease . . . . . . . . .          26

      Exhibit "A"

      Exhibit "B"

17600

## LEASE

THIS LEASE, made and entered into this $27\underline{\underline{E}}$ day of
_November_ , 198 4, between the SAN DIEGO UNIFIED PORT
DISTRICT, a public corporation, hereinafter called "Lessor," and
TELEDYNE INDUSTRIES, INC., acting by and through its Teledyne
Ryan Aeronautical Division hereinafter called "Lessee,"
WITNESSETH:

Lessor, for the consideration herein set forth, hereby
leases to Lessee for the term and upon the conditions hereinafter
set forth those lands granted to the San Diego
Unified Port District by that certain Act of the Legislature of
the State of California entitled "San Diego Unified Port District
Act," Stats. 1962, 1st Ex. Sess., 67, as amended, which lands
are more particularly described as follows:

> Approximately 1,940,016 square feet of tideland area
> located in the City of San Diego, California and more
> particularly described and delineated on Drawing No. 2608-B,
> dated August 20, 1984, attached hereto as Exhibits "A" and
> "B" and by this reference made a part hereof.

TO HAVE AND TO HOLD said leased premises for the term of this
lease and upon the conditions as follows:

1. TERM:   The term of this lease shall be for a period of
four (4) years, six (6) months, commencing on October 1, 1984,
and ending on March 31, 1989, unless sooner terminated as herein
provided; provided that Lessee shall have the option to extend
the term of this lease for seven (7) additional consecutive terms
of five (5) years each, with each additional term for which an
option is exercised to commence at the expiration of the
immediately preceding term; provided, however, that Lessee's
right to extend the term of this lease shall be subject to the
provisions of paragraph 4 below.  Each such option for each such
additional term shall be deemed automatically exercised unless
Lessee gives notice of nonrenewal in writing, which notice shall
be delivered to the Port Director of Lessor at least ninety (90)
days before the expiration of the immediately preceding term.
Time is of the essence of the construction and installations
referred to in paragraph 4 of said ninety (90) day notice.  Upon
timely performance of the provisions of paragraph 4, and if said

1

17600

notice of nonrenewal is not timely given, then the exercise of
said options as provided herein shall continue this lease in full
force and effect in accordance with the terms, covenants, and
conditions thereof, including the adjustment of rental as herein
provided.  To the extent Lessee shall either (i) fail to con-
struct and install said improvements and equipment or (ii) give
the Port Director of Lessor timely written notice of nonrenewal,
in accordance with this paragraph and paragraph 4 below, then the
option for said extension and all subsequent extensions shall
thereafter be and become null and void and of no further force
and effect.

2.  RENTAL:  Lessee agrees to pay to Lessor rent in accordance
with the following schedules and procedures:

    (a)  The term of this lease shall be divided into a series
        of rental periods.  The first such rental period
        consisting of fifty-four (54) months with each
        successive rental period consisting of sixty (60)
        months.  Each successive rental period shall commence
        at the expiration of the immediately preceding rental
        period.

    (b)  The ground rent for the first rental period shall be
        Nine Thousand Seven Hundred Six Dollars ($9,706) per
        month.  The ground rent for the second rental period
        shall be a sum per month agreed upon by Lessor and
        Lessee.  In the event the parties cannot agree to the
        ground rent for the second rental period, the ground
        rent shall be 25% of the amount established pursuant to
        the provisions of paragraph 2(d).  The ground rent for
        the third rental period shall be a sum per month agreed
        upon by Lessor and Lessee.  In the event the parties
        cannot agree to the ground rent for the second rental
        period, the ground rent shall be 50% of the amount
        established pursuant to the provisions of paragraph
        2(d); provided, however, that during the second and
        third rental periods the ground rents, whether
        established by agreement of the parties or pursuant to
        an arbitration award, shall be adjusted upward or
        downward after the expiration of the first thirty (30)
        months thereof for the final thirty (30) months of each
        rental period pursuant to the provisions of paragraph
        2(c).

    (c)  For the fourth and subsequent rental periods, the
        ground rent shall be a sum per month agreed upon by
        Lessor and Lessee.  In the event the parties cannot
        agree to the ground rent for such periods, the ground
        rent shall be the amount established pursuant to the
        provisions of paragraph 2(d); provided, however, that

**17600**

during the second and all subsequent rental periods the
ground rents, whether established by agreement of the
parties or pursuant to an arbitration award, shall be
adjusted upward or downward after the expiration of the
first thirty (30) months thereof (the adjustment date)
according to the following computation:  "The base
figure for computing the adjustment is the arithmetic
average of the three monthly index figures for the
sixth, fifth, and fourth months immediately preceding
the existing rental period as shown in the Consumer
Price Index for All Urban Consumers for Los Angeles/
Long Beach/Anaheim, CA/All Items based on the period
1967 = 100 as published by the United States Department
of Labor's Bureau of Labor Statistics.  The index
figure for the adjustment date is the arithmetic
average of the three monthly index figures of said
Consumer Price Index for All Urban Consumers for the
sixth, fifth, and fourth months immediately preceding
the adjustment date.

...e index for the adjustment date shall be computed as
a percentage of the base figure.  For example, assuming
the base figure is 110 and the index figure for the
adjustment is 121, the percentage to be applied is
121/110 = 1.10 = 110%.

That percentage of the base figure shall be applied to
the initial rent in effect at the beginning of the then
existing rental period and will continue for the
remaining 30 months of the rental period.

"In the event the Consumer Price Index for All Urban
Consumers for Los Angeles/Long Beach/Anaheim, CA/All
Items is no longer published, the index for the adjust-
ment date shall be the one reported in the U. S.
Department of Labor's comprehensive official index most
nearly answering the foregoing description of the
index.  If an index is calculated from a base different
from the base period 1967 = 100, the base figure used
for calculating the adjustment percentage shall first
be converted under a formula supplied by the Bureau.

"If the above described Department of Labor indices are
no longer published, another index generally recognized
as authoritative shall be substituted by agreement of
the parties.  If they are unable to agree within
60 days after demand by either party, a substitute
index will be selected by the Chief Officer of the
San Francisco Regional Office of the Bureau of Labor
Statistics or its successor.

**17600**

3

"Notwithstanding the publication dates of the index, the effective date of the rent adjustment is at the expiration of the first 30 months of each rental period. Until said rent adjustment can be reasonably determined by index publication, Lessee shall continue to make rental payments pursuant to this lease at the same rent in effect at the then existing rental period. Because of this provision, overpayment of rents shall be credited to the Lessee's rental account and under-payments of rent shall be immediately paid to the Lessor."

(d)   In the event the parties cannot agree to the ground rent for a rental period, the controversy as to rent for said period shall be determined by three arbitra-tors. After notice by either party to the other requesting arbitration, one arbitrator shall be appointed by each party. Notice of the appointment shall be given by each party to the other when made. The two arbitrators shall immediately choose a third arbitrator to act with them. If they fail to select a third arbitrator, on application by either party, the third arbitrator shall be promptly appointed by the then presiding judge of the Superior Court of the State of California, County of San Diego, acting in his individual capacity. The party making the application shall give the other party notice of his application. All of the arbitrators shall be qualified real estate appraisers. Each party shall bear the expense of its own appointed arbitrator and shall bear other expenses pursuant to Section 1284.2 of the Code of Civil Procedure of California. Hearings shall be held in the City of San Diego, California. The award shall be the decision of not less than two of the arbitrators. Said award shall be the rent which Lessor could derive from Lessor's property if it were vacant and made available on the open market for new leasing purposes at the commencement of the rental period under arbitration. For the purpose of this arbitration procedure, the arbitrators shall assume that the Lessor has a fee simple absolute estate. In determining what rent Lessor could derive from said property if it were made available on the open market for new leasing purposes, the arbitrators shall consider the property as if it were available to be leased for industrial uses. In determining the rates, returns, rents, and/or percentage rentals for said use and/or uses, the arbitrators shall use and analyze only that market data that is found in the open marketplace, such as is demanded and received by other Lessors for the same or similar uses as the arbitrators are required to

4

17600

consider.  In determining said rent, the arbitrators shall disregard the proximity of the leased premises to San Diego International Airport.  In all cases, the award shall be based upon recognized real estate appraisal principles and methods, subject to the limitation that the arbitrators shall disregard the proximity of the leased premises to San Diego International Airport.  The award determined by the arbitrators shall be effective and retroactive to the first day of the rental period under arbitration.  The award shall be in writing in the form of a report that is in accordance with the powers of the arbitrators herein, supported by facts and analysis and in accordance with law.  The arbitrators shall make copies of their report available to any ethical practice committee of any recognized professional real estate organization.  The arbitration shall be conducted under and subject to Section 1280 through 1294.2 of the Code of Civil Procedure of California.

(e)  In addition to the ground rental provided for in sections 2(a), (b) and (c), Lessee agrees to pay Lessor rent for Lessor-owned improvements located on the leased premises in accordance with the schedules and procedures:

   aa)  The sum of Three Thousand Five Hundred Dollars ($3,500) per month for the first rental period commencing on the effective date of this lease.  Said sum shall be due and payable in advance on or before the initial term of the lease.

   bb)  The sum of Thirty Thousand Two Hundred Eleven Dollars ($30,211) per month commencing April 1, 1989 and continuing for the entire remaining term of the lease including options.  Said sum shall be due and payable on or before the tenth day of each month during the remaining term of the lease.  Said sum shall not be subject to adjustment during the remaining term of the lease nor shall it be considered in establishing the ground rentals as provided for in section 2(d) above.

(f)  In the event Lessee is delinquent in rendering to Lessor an accounting of rent due or in remitting the rent due in accordance with the rental provisions of this lease, then the rent not paid when due shall bear interest at the rate of Ten Percent (10%) per annum from the date due until paid.  Provided, however, that

5

**17600**

the Port Director of Lessor shall have the right to
waive for good cause any interest payment upon written
application of Lessee for any such delinquency period.

(g)  Rentals shall be delivered to the Treasurer of the
San Diego Unified Port District at P. O. Box 488,
San Diego, California 92112.  The designated place of
payment may be changed at any time by Lessor upon ten
(10) days written notice to Lessee.  Lessee assumes all
risk of loss if payments are made by mail.

3.  USE:  Lessee agrees that the leased premises shall be used
only and exclusively for manufacturing purposes and for purposes
connected therewith and incidental thereto and for no other
purposes whatsoever without the written consent of Lessor,
evidenced by resolution, first had and obtained.

4.  CONSTRUCTION OF IMPROVEMENTS:

(a)  Lessee shall construct and install by March 31, 2004,
improvements and equipment in and to the leased
premises having an aggregate cost of not less than $28
million.  It is agreed that the cost of improvements
made on and to the leased premises prior to the
commencement of this lease, but subsequent to
October 1, 1982, shall be included and calculated
towards satisfying the investment requirements of
constructing and installing new improvements and
equipment under this lease.  Improvements and equipment
shall include new machinery and equipment; new build-
ings; renovation and improvements to land, buildings
and equipment, which involves rehabilitation or upgrad-
ing of existing land, buildings and equipment that
results in an increase in the value of existing
facilities or in the productive capacity thereof,
including, without limiting the generality of the
foregoing, the upgrading of outmoded office or factory
areas to current standards, conversion of existing
building space to office or factory space, installation
of safety, pollution control, and energy control
equipment such as scrubbers, catwalks and controls, the
relighting of plant areas to increase light intensity,
or the rebuilding of a machine tool to as-new
tolerances and productivity; non-recurring maintenance;
facility rearrangements which involves the relocation
of existing machinery and equipment to new locations or
to clear an area for the activation of a new production
program, to provide area for new machines, or to expand
manufacturing operations or consolidate factory or
office functions; and tools and manufacturing aids
constructed and utilized on the leased premises.

**17600**

Improvements and equipment shall not include such things as routine maintenance and repairs. Should the aggregate cost of such new improvements and equipment constructed and installed prior to March 31, 2004, be less than $28 million, then Lessee shall have the right to exercise its options to extend the term of this lease, as referred to in paragraph 1, above, as follows: If the aggregate cost is less than $28 million but more than $24.5 million, then the last option may not be exercised and shall be void; should the aggregate cost be $24.5 million or less but more than $21 million, then the last two (2) options may not be exercised and shall be void; should the aggregate cost be $21 million or less but more than $17.5 million, then the last three (3) options may not be exercised and shall be void; should the aggregate cost be $17.5 million or less but more than $14 million, then the last four (4) options may not be exercised and shall be void.

(b)  The construction of improvements and installation of equipment contemplated by this lease are intended to be in furtherance of operation, replacement and reconstruction of existing facilities. There may be some minimal new construction but nothing is anticipated which will be beyond the purview of the categorical exemptions provided for in the State of California Resources Agency Guidelines and the environmental procedures of the Lessor. The parties acknowledge, however, that in the event at any time during the term of this lease circumstances change and improvements are proposed by Lessee which are determined by Lessor to be within the scope of any then applicable environmental quality act and laws, it may then be necessary for Lessor to either approve or disapprove (and thereby prohibit) the construction of such improvements in accordance with any such act or laws and other applicable provisions of this lease, including without limitation, paragraphs 4 and 6. In the event there is such a disapproval, unless and except such disapproval is abrogated through judicial action and said improvements are in fact constructed on the leased premises in accordance with the applicable lease provisions, neither shall 1) the cost of such a proposed improvement be credited toward the cost of any improvement, nor 2) the time for completion of any improvements be extended, waived or suspended, for the purpose of performing or otherwise legally fulfilling any condition precedent to the right to exercise any option to extend this lease pursuant to paragraphs 1 and 4 thereof.

17600

7

**(c)** As provided in paragraph 6 below, no construction of any improvements upon the leased premises shall commence without the prior approval of the Port Director of Lessor, as evidenced in writing, and all such construction shall be in accordance with plans and specifications which must be submitted to and approved by the Port Director in writing prior to the commencement of any such construction.

**(d)** When required by Lessor, Lessee shall pave or plant ground cover, at its own cost and expense, over the entire ground area of the leased premises not covered by buildings. All paving or ground cover shall be in accordance with plans and specifications approved by the Port Director in writing prior to the commencement of any such paving or planting.

**(e)** Within sixty (60) days following the end of a fiscal year of Lessee in which any substantial improvement or equipment installation is completed, and in any event, no later than March 31, 1998, Lessee shall furnish Lessor an itemized statement of the actual cost of such improvement and equipment. The statement of cost shall be sworn to and signed by Lessee or his responsible agent under penalty of perjury. Lessor shall have the right at any and all reasonable times to examine and audit Lessee's books and records pertaining to improvements and equipment for the purpose of determining the accuracy of the statements of cost submitted by Lessee. Lessor's right to examine and audit Lessee's books and records shall be without restriction except that said audit and examination shall be subject to such controls as may be required by authorities administering the National Security Laws.

**5.** **ACCESS TO AND USE OF LINDBERGH FIELD:**

**(a)** Subject to the provisions of subparagraphs (b) and (c) below, Lessee shall, at all times during the term of this lease or any renewal thereof, have the right of reasonable, free, and nonexclusive access to and use of the airfield at Lindbergh Field as it now exists or as it may be extended, enlarged or improved, for flying purposes, and as a port, landing field, and terminal for aircraft.

**(b)** The parties acknowledge that the leased premises are located immediately adjacent to a usable airfield, and that the continued existence of an airfield at Lindbergh Field (whether or not a commercial airport is maintained there) is an important factor to Lessee.

**17600**

The parties further understand and agree that the
decision whether a usable airfield may be maintained at
the Lindbergh Field location may be beyond the control
of Lessor and, therefore, the Lessor cannot agree to
the continued existence of said airfield.  Lessor does
agree, however, that it has no present intention to
voluntarily cause said airfield to be closed or other-
wise unusable by Lessee as provided above prior to the
expiration date of the last remaining exercisable
option to extend the term of this lease as referenced
in paragraph 1, above.  Should said airfield neverthe-
less and irrespective of cause become closed or
unusable by Lessee, Lessee's sole remedy therefor shall
be to terminate this lease and Lessee shall not be
entitled to any damages or reduction in rent because of
such closure or unusability.

(c)  Lessee agrees that the exercise of its rights of access
to and use of Lindbergh Field, as above provided, will
be subject to all valid and applicable rules and
regulations of Lessor in its governmental or propri-
etary capacity and other public agencies having
jurisdiction.

6.  IMPROVEMENTS:  Lessee may, at its own expense, make any
alterations or changes in the leased premises or cause to be
built, made or installed thereon any structures, machines,
appliances, utilities, signs or other improvements necessary or
desirable for the use of said premises and may alter and repair
any such Lessee-owned structures, machines or other improvements;
provided, however, that any new buildings or structures, and
major alterations to existing buildings or structures, shall be
in accordance with plans and specifications previously submitted
to the Port Director of Lessor and approved in writing by him.

Lessee further agrees that no banners, pennants, flags, eye-
catching spinners or other advertising devices, nor any signs
visible from outside the leased premises shall be permitted to be
flown, installed, placed, or erected on the premises without
written consent of the Port Director of Lessor.

7.  TITLE TO IMPROVEMENTS:  On the commencement date of the term
of this lease, all existing structures, buildings, installations,
and improvements of any kind located on the leased premises are
owned by and title thereto is vested in Lessee except for build-
ing nos. 102, 127, 140, 142, 146, 147, 148, 149, 150 and 166,
title to which is vested in Lessor.  All said existing struc-
tures, buildings, installations and improvements whether owned by
Lessee or Lessor as well as structures, buildings, installations

17600

9

and improvements of any kind placed on the leased premises by
Lessee subsequent to the commencement date of the term of this
lease shall at the option of Lessor be removed by Lessee at
Lessee's expense. Lessor may exercise said option as to any or
all of the structures, buildings, installations and improvements
either before or after the expiration or sooner termination of
this lease. If Lessor exercises such option, Lessee shall remove
such structures, buildings, installations or improvements within
sixty (60) days after the expiration of the term of this lease or
sooner termination thereof. If Lessee fails to remove such
structures, buildings, installations or improvements within
said sixty (60) days, Lessor shall have the right to have such
structures, buildings, installations or improvements removed at
the expense of Lessee. As to any or all structures, buildings,
installations or improvements owned by Lessee for which Lessor
does not exercise said option for removal, title thereto shall
vest in the Lessor without cost to Lessor and without any payment
to Lessee.

Machines, appliances, equipment and trade fixtures of any kind
now existing or hereafter placed on the leased premises by Lessee
are owned by and title thereto is vested in Lessee and shall be
removed by Lessee within sixty (60) days after the expiration of
the term of this lease or sooner termination thereof; provided,
however, Lessee agrees to repair any and all damage occasioned by
the removal thereof. If any such machines, appliances, equipment
and trade fixtures are not removed within sixty (60) days after
the termination of this lease, the same may be considered
abandoned and shall thereupon become the property of Lessor
without cost to the Lessor and without any payment to Lessee;
except that Lessor shall have the right to have the same removed
at the expense of Lessee.

During any period of time employed by Lessee under this paragraph
to remove improvements, Lessee shall pay rent to Lessor in
accordance with this lease, which said rent shall be prorated for
the period of such removal operations (less, however, an amount
reasonably attributable to those parts of the leased premises
that Lessee proves were not occupied or interferred with by
Lessee's removal operations and which Lessor could therefore with
reasonable efforts lease to others).

8. LIENS: Lessee agrees that it will at all times save Lessor
free and harmless and indemnify it against all claims for labor
or materials in connection with improvements, repairs, or
alterations on the leased premises, and the costs of defending
against such claims, including reasonable attorney's fees.

In the event that any lien or levy of any nature whatsoever is
filed against the lease premises or the leasehold interests of
the Lessee therein, the Lessee shall, upon written request of

L. 17600

Lessor, deposit with Lessor a bond conditioned for the payment in full of all claims upon which said lien or levy has been filed. Such bond shall be acknowledged by Lessee as principal and by a corporation, licensed by the Insurance Commissioner of the State of California to transact the business of a fidelity and surety insurance company, as surety. Lessor shall have the right to declare this lease in default in the event the bond required by this paragraph has not been deposited with the Lessor within ten (10) days after written request has been delivered to Lessee.

9. LEASE ENCUMBRANCE: Lessee understands and agrees that it cannot encumber the lease, leasehold estate and the improvements thereon by a deed of trust, mortgage or other security instrument to assure the payment of the promissory note of Lessee without the prior express written consent by resolution of Lessor in each instance. If any deed of trust, mortgage or other security instrument that encumbers the lease, leasehold estate and the improvements thereon is entered into by Lessee without Lessor's prior express written consent, Lessor shall have the right to declare this lease in default.

If a deed of trust, mortgage, or other security instrument which Lessor has consented to by resolution, should at any time be in default, before Lessee's interest under said lease may be sold as part of any foreclosure or trustee's sale or be assigned in lieu of foreclosure, the prior express written consent by resolution of Lessor shall be obtained in each instance. However, the original beneficiary of the deed of trust, the original mortgagee of the mortgage, and the original holder of the security instrument which the Lessor has consented to by resolution may purchase the Lessee's interest at a foreclosure or trustee's sale or accept assignment of the lease in lieu of foreclosure, without the requirement of any further consent on the part of Lessor provided said party, as an express condition precedent, agrees in writing to assume each and every obligation under the lease. Furthermore, before any said original beneficiary, mortgagee, or holder of a security instrument, or any other consented-to assignee or purchaser may subsequently assign or sublet any of the leasehold or Lessee's interest, it shall obtain the Lessor's prior express written consent by resolution. The decision of the Board of Port Commissioners of Lessor as to such assignee, purchaser, or subtenant shall be final.

10. ASSIGNMENT-SUBLEASE:

> (a) Lessee agrees not to assign or transfer the whole or any part of this lease or any interest therein, nor to sublease the whole or any part of the leased premises, nor to permit the occupancy of any part thereof by any

**17600**

other person, nor to permit transfer of the lease or possession of the leased premises by merger, consolidation, or dissolution, without the consent of Lessor, evidenced by resolution, first had and obtained in each instance. Lessee further agrees that no assignment, voluntary or involuntary, in whole or in part of this lease, or any interest therein, and no sublease of the whole or any part of the leased premises and no permission to any person to occupy the whole or any part of the leased premises shall be valid or effective without the consent of Lessor, first had and obtained in each instance; provided, however, that nothing herein contained shall be construed to prevent the occupancy of said premises by any employee, or business invitee of Lessee.

(b) Notwithstanding the foregoing, Lessee may, without the consent of Lessor, sublet this lease or any part thereof to a corporation that effectively controls or is controlled by Lessee. For purposes of the foregoing, the term "Lessee" shall be deemed to include Lessee's Teledyne Ryan Aeronautical Division; and "effective control" shall mean control in fact in light of all of the facts and circumstances, including but not limited to the applicable documents and law.

(c) No assignment or subletting shall relieve Lessee from liability under this lease without the express consent by resolution of Lessor.

(d) In the event any consent for which Lessor's consent is required of Lessor is given for any lease assignment or transfer, the following shall apply in each instance: (i) the Lessor shall be paid additional rent, which may be percentage rate or rates, to equal the full fair market rent, commencing on the effective date of such proposed assignment or transfer, unless on that date the rent being paid under this lease is equal to the full fair market rent; (ii) the Assignee hereby agrees and assumes each and every obligation under the lease, and (iii) other conditions and qualifications

determined by the Board of Port Commissioners of Lessor. The rent under this lease and any change resulting therein effective upon any lease assignment or transfer as provided in this paragraph shall be for the remainder of the rental period during which it occurs, and any said rent shall thereafter be subject to rental review at the commencement of subsequent and succeeding rental periods in accordance with the provisions of Paragraph 2 of this lease.

**17600**

Notwithstanding the foregoing, if a change in rent is made which becomes effective upon any lease assignment or transfer, the rent shall be subject to any adjustment applicable during the remainder of said rental period during which the lease assignment or transfer occurred based on the change in the Consumer Price Index if such adjustment is provided for in Paragraph 2 of this lease; provided, however, the "base figure for computing the adjustment" shall be the arithmetic average of the three monthly index figures for the sixth, fifth and fourth months immediately preceding the effective date of such proposed assignment or transfer for which the Assignee pays additional rent to Lessor to equal the full fair market rent and the "index figure for the adjustment date" shall be the arithmetic average of the three monthly index figures of said Consumer Price Index for the sixth, fifth and fourth months immediately preceding the date such adjustment is effective.

In the event any consent of Lessor is given to sub-lease, the following shall apply in each instance:  (i) the Lessor shall be paid additional rent, which may be percentage rate or rates, to equal the full fair market rent for the sublease area, commencing on the effective date of such proposed sublease and continuing for a specified period of time which shall not extend beyond the remainder of the master lease rental period during which it occurs or until the termination of the sub-lease, whichever occurs first, unless on that date the rent being paid under this lease for said area is equal to the full fair market rent, and (ii) other conditions and qualifications determined by the Board of Port Commissioners of Lessor.  As long as said sublease is in effect, said rent for the sublease area shall thereafter be subject to rental review at the commence-ment of subsequent and succeeding master lease rental periods, in accordance with the provisions of Paragraph 2 of this lease.

In the event the parties cannot agree to an amount that is equal to the full fair market rent described in this paragraph, the full fair market rent shall be determined by the arbitration procedure described in paragraph 2(c) of this lease, except that the arbitra-tion award shall be for a limited period of time commencing and ending as provided in this paragraph and not for a "rental period" as specified in said para-graph 2(c).  Until said full fair market rent is determined pursuant to said paragraph 2(c), the Lessee shall continue to make rental payments as required by

17600

this lease at the same rate or rates in effect on the
effective date of the lease assignment or sublease.
Because of this provision, underpayment of rent, if
any, shall be paid to Lessor within ten (10) days of
the date that the full fair market rent is determined
by said arbitration procedure.

11.  DEFAULT:  It is mutually understood and agreed that if any
default be made in the payment of rental herein provided or in
the performance of the covenants, conditions, or agreements
herein (any covenant or agreement shall be construed and
considered as a condition), or should Lessee fail to fulfill in
any manner the uses and purposes for which said premises are
leased as above stated, and such default shall not be cured
within five (5) days after written notice thereof if default is
in the submittal of a report of gross income if required in this
lease or ten (10) days after written notice thereof if default is
in the performance of the use obligation provisions pursuant to
paragraph 15 of this lease, or thirty (30) days after written
notice thereof if default is in the payment of rent, or sixty
(60) days after written notice thereof if default is in the
performance of any other covenant, condition and agreements (any
covenant or agreement shall be construed and considered as a
condition), Lessor shall have the right to immediately terminate
this lease; and that in the event of such termination, Lessee
shall have no further rights hereunder and Lessee shall thereupon
forthwith remove from said premises and shall have no further
right to claim thereto, and Lessor shall immediately thereupon,
without recourse to the courts, have the right to reenter and
take possession of the leased premises.  Lessor shall further
have all other rights and remedies as provided by law, including
without limitation the right to recover damages from Lessee in
the amount necessary to compensate the Lessor for all the detri-
ment proximately caused by the Lessee's failure to perform his
obligations under the lease or which in the ordinary course of
things would be likely to result therefrom.

In the event Lessor consents to an encumbrance of the Lease for
security purposes in accordance with paragraph 9 of this lease,
it is understood and agreed that Lessor shall furnish copies of
all notices of defaults to the beneficiary or mortgagee under
said encumbrance by certified mail contemporaneously with the
furnishing of such notices to Lessee, and in the event Lessee
shall fail to cure such default or defaults within the time
allowed above, said beneficiary or mortgagee shall be afforded
the right to cure such default at any time within fifteen (15)
days following the expiration of the period within which Lessee
may cure such default, provided, however, Lessor shall not be
required to furnish any further notice of default to said benefi-
ciary or mortgagee.

**17600**

14

In the event of the termination of this lease pursuant to the provisions of this paragraph, Lessor shall have any rights to which it would be entitled in the event of the expiration or sooner termination of this lease under the provisions of paragraph 7.

**12.  BANKRUPTCY:**  In the event Lessee becomes insolvent, makes an assignment for the benefit of creditors, becomes the subject of a bankruptcy proceeding, reorganization, arrangement, insolvency, receivership, liquidation, or dissolution proceedings, or in the event of any judicial sale of Lessee's interest under this lease, Lessor shall have the right to declare this lease in default.

The conditions of this paragraph shall not be applicable or binding on Lessee or the beneficiary in any deed of trust, mortgage, or other security instrument on the demised premises which is of record with Lessor and has been consented to by resolution of Lessor, or to said beneficiary's successors in interest consented to by resolution of Lessor, as long as there remains any monies to be paid by Lessee to such beneficiary under the terms of such deed of trust; provided that such beneficiary or its successors in interest, continuously pay to the Lessor all rent due or coming due under the provisions of this lease and the premises are continuously and actively used in accordance with paragraph 15 of this lease.

**13.  EMINENT DOMAIN:**  If the whole or a substantial part of the premises hereby leased shall be taken by any public authority under the power of eminent domain, then the term of this lease shall cease as to the part so taken, from the day the possession of that part shall be taken for any public purpose, and the rent shall be paid up to that day, and from that day Lessee shall have the right either to cancel this lease and declare the same null and void or to continue in the possession of the remainder of the same under the terms herein provided, except that the minimum rent shall be reduced in proportion to the amount of the premises taken.  All damages awarded for such taking shall belong to and be the property of Lessor whether such damages shall be awarded as compensation for diminution in value to the leasehold or to the fee of the premises herein leased; provided, however, that Lessor shall not be entitled to any award made for the taking of any installations or improvements on the leased premises belonging to Lessee.

**14.  SUPERSEDURE:**  This lease upon becoming effective shall supersede and annul any and all permits, leases or rental agreements heretofore made or issued for the leased premises between Lessor and Lessee, and any such permits, leases or rental agreements shall hereafter be void and of no effect except as to any rentals and/or fees which may have accrued thereunder or any rights and remedies granted to Lessor under such agreements.

**17600**

**15. USE OBLIGATION:** Lessee shall actively and continuously use and operate the premises for the limited particular exclusive use as expressly provided for in the Use paragraph of this lease, except for failure to so use caused by reason of wars, strikes, riots, civil commotion, acts of public enemies, lock-outs, labor troubles, inability to procure materials, restrictive governmental laws and regulations, or other causes beyond the reasonable control of Lessee (financial inability excepted), damage or destruction of the leased premises, and acts of God. Said active and continuous use and operation enhances the value of the tide-lands, provides needed public service, provides additional employment, taxes, and other benefits to the general economy of the area. Lessee, however, shall not and is expressly prohibited from using the premises for any other purpose or use whatsoever, whether it is purported to be in addition to or in lieu of the particular exclusive use expressed in said Use paragraph.

**16. MAINTENANCE AND REPAIR:** As part of the consideration for the leasing thereof, Lessee shall maintain and repair those parts of the leased premises and all improvements of any kind which have been or may be erected, installed or made thereon that are visible to the public in good and substantial repair and condition, including without limitation the painting thereof, and shall make all necessary repairs and alterations thereto, hereby waiving all right to make repairs at the expense of Lessor as provided in Section 1942 of the California Civil Code and all rights provided by Section 1941 of said Code. Lessor shall not be required at any time to maintain or to make any improvements or repairs whatsoever on or for the benefit of the leased premises. Lessee shall, as further consideration for the leasing thereof, keep such visible part of the leased premises and improvements and installation thereon in a reasonably clean and sanitary condition and provide proper containers for and keep the leased premises free and clear of rubbish, garbage, and other waste. Subject to national security clearance requirements, Lessor shall at all times during ordinary business hours have the right to enter upon and inspect the leased premises and any improvements thereon.

**17. PERFORMANCE BOND:** No major construction shall be commenced upon the demised premises by Lessee until Lessee has secured and submitted to Lessor performance bonds in the amount of the total estimated construction cost of improvements to be constructed by Lessee. In lieu of said performance bonds, the Port Director of Lessor may at his sole discretion accept the performance and labor and material bonds supplied by Lessee's contractor or subcontractors, or performance guarantees, or other satisfactory evidence that said construction will be timely completed. Said bonds must be issued by a company qualified to do business in the State of California and be in a form acceptable to Lessor.

**17600**

**18.  TAXES AND UTILITIES:**  This lease may result in a taxable
possessory interest and be subject to the payment of property
taxes.  Lessee agrees to and shall pay before delinquency all
taxes and assessments of any kind assessed or levied upon Lessee
or the leased premises by reason of this lease or of any build-
ings, machines, or other improvements of any nature whatsoever
erected, installed or maintained by Lessee or by reason of the
business or other activities of Lessee upon or in connection with
the leased premises.  Lessee shall also pay any fees imposed by
law for licenses or permits for any business or activities of
Lessee upon the leased premises or under this lease, and shall
pay before delinquency any and all charges for utilities at or on
the leased premises.

**19.  CONFORMANCE WITH RULES AND REGULATIONS:**  Lessee agrees that
in all activities on or in connection with the leased premises
and in all uses thereof, including the making of any alterations
or changes and the installation of any machines or other improve-
ments, it will abide by and conform to all rules and regulations
prescribed by the San Diego Unified Port District Act, any
ordinances of the City in which the leased land is located,
including the Building Code thereof, and any ordinances and
general rules of the Lessor, including tariffs, <u>and any applica-
ble laws of the State of California and Federal Government</u>, as
any of the same now exist or may hereafter be adopted or amended;
provided, however, that nothing herein contained shall preclude
Lessee from contesting in good faith any such rule or regulation
in the manner provided by law.

**20.  NON-DISCRIMINATION:**  It is mutually agreed that no person on
the grounds of sex, race, color, or national origin shall be
excluded from participation in, denied the benefits of, or be
otherwise subjected to discrimination in the use of the leased
premises.  It is further agreed that in the construction of any
improvements on, over, or under the leased premises, and the
furnishing of services thereon, no person on the grounds of sex,
race, color, or national origin shall be excluded from
participation in, denied the benefits of, or otherwise be
subjected to discrimination.  The Lessee shall use the leased
premises in compliance with all other requirements imposed by or
pursuant to Title 49, Code of Federal Regulations, Department of
Transportation, Subtitle A, Office of the Secretary, Part 21,
Nondiscrimination in Federally-assisted Programs of the
Department of Transportation-Effectuation of Title VI of the
Civil Rights Act of 1964, and as said regulations may be amended.
It is agreed that compliance with applicable final orders of
state or federal regulatory agencies and all final judgments of
courts having jurisdiction, if any, shall constitute full
compliance with this provision.

**17600**

21. **PARTIAL INVALIDITY:** If any term, covenant, condition, or provision of this lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated thereby.

22. **HOLD HARMLESS:** Lessee shall defend, indemnify, and hold harmless Lessor, its officers and employees against causes of action, liability, damage, and expense, including reasonable attorney's fees, for judicial relief of any kind, for damage to property of any kind whatsoever and to whomever belonging, including without limitation Lessee or its employees, or injury or death of any person or persons, including without limitation Lessee or its employees, resulting directly or indirectly from granting and performance of this lease or arising from the use and operation of the leased premises or any defect in any part thereof.

23. **SUCCESSORS IN INTEREST:** Unless otherwise provided in this lease, the terms, covenants and conditions herein shall apply to and bind the heirs, successors, executors, administrators, and assigns of all the parties hereto, all of whom shall be jointly and severally liable hereunder.

24. **EASEMENTS:** This lease and all rights given hereunder shall be subject to all easements and rights-of-way now existing or heretofore granted or reserved by Lessor in, to or over the leased premises for any purpose whatsoever, and shall be subject to such rights-of-way for reasonable access, sewers, pipelines, conduits and such telephone, cable television, telegraph, light, heat, or power lines as may from time to time be determined by Lessor to be in the best interests of the development of the tidelands.

Lessor agrees that such easements and rights-of-way shall be so located and installed as to produce a minimum amount of interference to the business of Lessee.

25. **TITLE OF LESSOR:** Lessor's title is derived from the provisions of the San Diego Unified Port District Act, Appendix 1, Harbors & Navigation Code, and is subject to the provisions of said Act. This lease is granted subject to the terms and conditions of said Act.

26. **INSURANCE:** Lessee shall maintain insurance acceptable to Lessor in full force and effect throughout the term of this lease. The policies for said insurance shall, as a minimum, provide the following forms of coverage:

    A.    <u>Comprehensive Public Liability</u> (covering premises and operations) in the amount of not less than One Million Dollars ($1,000,000) combined single limit.

**17600**

**B.   Fire and Extended Coverage**, including water damage and **debris** cleanup provisions in an amount not less than **ninety** percent (90%) of full replacement value of all **improvements** located within the leased premises.  The **fire** and extended coverage policies shall provide that **any** insurance proceeds in excess of $100,000 resulting **from** a loss under said policies shall be payable **jointly** to Lessor and Lessee in order that said **proceeds** will be reinvested in rebuilding and/or **repairing** the damaged portions of the leased premises; **provided,** however, that within the period during which **there** is in existence a mortgage or deed of trust upon **the** leasehold given by Lessee with the prior consent of **Lessor,** then and for that period all fire and extended **coverage** policies shall be made payable jointly to the **mortgagee** or beneficiary and Lessee, and any proceeds **collected** therefrom shall be held by said mortgagee or **beneficiary** for the following purposes:

(1)   As a trust fund to pay for the reconstruction, repair, or replacement of the damaged or destroyed improvements in kind and scope in progress payments as the work is performed with any excess remaining after completion of said work to be retained by said mortgagee or beneficiary and applied to reduction of the debt secured by such mortgage or deed of trust and with any excess remaining after full payment of said debt to be paid over to Lessee; or

(2)   In the event that this lease is terminated with consent of both Lessor and mortgagee or beneficiary and said improvements are not reconstructed, repaired, or replaced, the insurance proceeds shall be retained by said mortgagee or beneficiary to the extent necessary to fully discharge the debt secured by said mortgage or deed of trust and said mortgagee or beneficiary shall hold the balance thereof without liability to restore the premises to a neat and clean condition and then for Lessor and Lessee as their interests may appear.

**C.   Blanket Contractual Coverage**

**The Comprehensive** Public Liability insurance shall be in force **the first day** of the term of this lease.  The Fire insurance

17600

shall be in force upon the date of completion of construction of each major insurable improvement by Lessee.

Certificates in a form acceptable to Lessor evidencing the existence of the necessary insurance policies shall be kept on file with Lessor during the entire term of this lease. All insurance policies will name Lessor as an additional insured, protect Lessor against any legal costs in defending claims and will not terminate without written notice to Lessor. All insurance companies must be satisfactory to Lessor and licensed to do business in California.

Lessor shall retain the right at any time to review the coverage, form, and amount of the insurance required hereby. If, in the opinion of Lessor, the insurance provisions in this lease do not provide adequate protection for Lessor and/or for members of the public using the leased premises, Lessor may require Lessee to obtain an insurance sufficient in coverage, form and amount to provide adequate protection. Lessor's requirements shall be reasonable but shall be designed to assure protection from and against the kind and extent of risk which exist at the time a change in insurance is required.

Lessor shall notify Lessee in writing of changes in the insurance requirements and, if Lessee does not deposit certificates evidencing acceptable insurance policies with Lessor incorporating such changes within sixty (60) days of receipt of such notice, this lease shall be in default without further notice to Lessee, and Lessor shall be entitled to all legal remedies.

If Lessee fails or refuses to maintain insurance as required in this Lease, or fails to provide the proof of insurance, Lessor has the right to declare this Lease in default without further notice to Lessee and Lessor shall be entitled to exercise all legal remedies.

The procuring of such required policies of insurance shall not be construed to limit Lessee's liability hereunder, nor to fulfill the indemnification provisions and requirements of this lease. Notwithstanding said policies of insurance, Lessee shall be obligated for the full and total amount of any damage, injury, or loss caused by negligence or neglect connected with this lease or with the use or occupancy of the leased premises.

Lessee agrees not to use the premises in any manner, even if use is for purposes stated herein, that will result in the cancellation of any insurance Lessor may have on the premises or an adjacent premises, or that will cause cancellation of any other insurance coverage for the premises or adjoining premises. Lessee further agrees not to keep on the premises or permit to be kept, used, or sold thereon, anything prohibited by any fire or

17600

other insurance policy covering the premises.  Lessee shall, at its sole cost and expense, comply with any and all requirements, in regard to premises, of any insurance organization necessary for maintaining fire and other insurance coverage at reasonable cost.

27.  POLICY OF LESSOR:  It is the policy of the Lessor that prevailing wage rates shall be paid all persons who are employed by Lessee on the tidelands of Lessor.

28.  WARRANTIES-GUARANTEES-COVENANTS:  Lessor makes no warranty, guarantee, covenant, including but not limited to covenants of title and quiet enjoyment, or averment of any nature whatsoever concerning the condition of the leased premises, including the physical condition thereof, or any condition which may affect the leased premises, and it is agreed that Lessor will not be responsible for any loss, damage or costs which may be incurred by Lessee by reason of any such condition or conditions.

29.  DAMAGE TO OR DESTRUCTION OF PREMISES:  In the event of damage to or destruction by fire, the elements, acts of God, or any other cause, of Lessee-constructed improvements located within the demised premises or in the event Lessee-constructed improvements located within the demised premises are declared unsafe or unfit for use or occupancy by a public entity with the authority to make and enforce such declaration, Lessee shall, within ninety (90) days, commence and diligently pursue to completion the repair, replacement, or reconstruction of improvements necessary to permit full use and occupancy of the demised premises for the purposes required by this lease.  Repair, replacement or reconstruction of improvements within the demised premises shall be accomplished in a manner and according to plans approved by Lessor; provided, however, Lessee shall not be obligated to repair, reconstruct or replace the improvements following their destruction in whole or substantial part except to the extent the loss is covered by insurance required to be carried by Lessee pursuant to paragraph 26 of this Lease (or would be covered whether or not such required insurance is actually in effect).  If Lessee elects not to restore, repair or reconstruct as herein provided, then the Lease shall terminate and Lessor shall have any rights to which it would be entitled under the provisions of paragraph 7.

30.  QUITCLAIM OF LESSEE'S INTEREST UPON TERMINATION:  Upon termination of this lease for any reason, including but not limited to termination because of default by Lessee, Lessee shall execute, acknowledge and deliver to Lessor within thirty (30) days after receipt of written demand therefor a good and sufficient deed whereby all right, title and interest of Lessee in the demised premises is quitclaimed to Lessor.  Should Lessee fail or refuse to deliver the required deed to Lessor, Lessor may prepare

17600

and record a notice reciting the failure of Lessee to execute, acknowledge and deliver such deed and said notice shall be conclusive evidence of the termination of this lease and of all right of Lessee or those claiming under Lessee in and to the demised premises.

31. PEACEABLE SURRENDER: Upon the expiration of this lease or the earlier termination or cancellation thereof, as herein provided, Lessee will peaceably surrender said premises to Lessor in as good condition as said premises were at the date of this lease, ordinary wear and tear excepted. If the Lessee fails to surrender the premises at the expiration of this lease or the earlier termination or cancellation thereof, Lessee shall defend and indemnify Lessor from all liability and expense resulting from the delay or failure to surrender, including, without limitation, any succeeding Lessee's claims based on Lessee's failure to surrender.

32. WAIVER: Any waiver by Lessor of any breach by Lessee of any one or more of the covenants, conditions, or agreements of this lease shall not be nor be construed to be a waiver of any subsequent or other breach of the same or any other covenant, condition or agreement of this lease, nor shall any failure on the part of Lessor to require or exact full and complete compliance by Lessee with any of the covenants, conditions, or agreements of this lease be construed as in any manner changing the terms hereof or to prevent Lessor from enforcing the full provisions hereof. The subsequent acceptance of rent hereunder by Lessor shall not be deemed to be a waiver of any preceding breach by Lessee of any term, covenant, or condition of this lease, other than the failure of Lessee to pay the particular rental so accepted, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such rent.

33. HOLD OVER: This lease shall terminate without further notice at expiration of the term. Any holding over by Lessee after either expiration or termination shall not constitute a renewal or extension or give Lessee any rights in or to the leased premises. If Lessee, with Lessor's consent, remains in possession of the leased premises after expiration or termination of the term or after the date in any notice given by Lessor to Lessee terminating this lease, such possession by Lessee shall be deemed to be a month-to-month tenancy terminable on thirty (30) days notice given at any time by either party. During any such month-to-month tenancy, Lessee shall pay all rent required by this lease, and if percentage rent is required by the lease, it shall be paid monthly on or before the tenth (10th) day of each month.

All provisions of this lease, except those pertaining to term, shall apply to the month-to-month tenancy.

**17600**

22

**34.** SECTION HEADINGS:  The Table of Contents and section head-ings contained herein are for convenience in reference and are not intended to define or limit the scope of any provision thereof.

**35.** ENTIRE UNDERSTANDING:  This lease contains the entire and only understanding and agreement of the parties, and Lessee, by accepting the same, acknowledges that there is no other written or oral understanding or agreement between the parties with respect to the demised premises and that this lease supersedes all prior negotiations, discussions, obligations and rights of the parties hereto.  No waiver, modification, amendment or alteration of this lease shall be valid unless it is expressly in writing and signed by authorized persons of the parties hereto. Each of the parties to this lease acknowledges that no other party, nor any agent or attorney of any other party, has made any promise, representations, waiver or warranty whatsoever, expressed or implied, which is not expressly contained in writing in this lease, and, each party further acknowledges that it has not executed this lease in reliance upon any collateral promise, representation, waiver or warranty, or in reliance upon any belief as to any fact not expressly recited in this lease.

**36.** TIME IS OF THE ESSENCE:  Time is of the essence of each and all of the terms and provisions of this lease and this lease shall inure to the benefit of and be binding upon the parties hereto and any successors of Lessee as fully and to the same extent as though specifically mentioned in each instance, and all covenants, stipulations and agreements in this lease shall extend to and bind any assigns and sublessees of Lessee.

**37.** ATTORNEY'S FEES:  In the event any suit is commenced by Lessor against Lessee to enforce the payment of any rent due or to enforce any of the terms and conditions hereof, or in case Lessor shall commence summary action under the laws of the State of California relating to the unlawful detention of property, for the forfeit of this Lease, and the possession of said premises, provided Lessor effects a recovery, Lessee shall pay Lessor all costs expended in any such action, together with a reasonable attorney's fee to be fixed by the Court.

**38.** NOTICES:  Notices given or to be given by Lessor or Lessee to the other may be personally served upon Lessor or Lessee or any person hereafter authorized by either in writing to receive such notice or may be served by certified letter addressed to the appropriate address hereinafter set forth or to such other address as Lessor and Lessee may hereafter designate by written notice.  If served by certified mail, forty-eight (48) hours after deposit in the U.S. Mail, service will be considered completed and binding on the party served.

**17600**

To Lessor                                    To Lessee

Port Director                                Teledyne Industries, Inc.
San Diego Unified Port District              2701 North Harbor Drive
Post Office Box 488                          San Diego, CA  92138-9012
San Diego, California    92112

Said notices shall also be served by certified letter to the
beneficiary of any deed of trust, mortgage, or other security
instrument of record with Lessor and consented to by resolution
of Lessor who has notified Lessor in writing of its desire to
receive said notice.

**39.** REMOVAL OF MATERIALS:  Lessee hereby agrees that upon the
expiration of this lease or the sooner termination as herein
provided, it will remove within sixty (60) days all ships,
vessels, barges, hulls, debris, surplus and salvage materials
from the land area forming a part of or adjacent to the leased
premises, so as to leave the same in as good condition as when
first occupied by Lessee; provided, however, that if any said
ships, vessels, barges, hulls, debris, surplus and salvage
materials shall not be so removed within sixty (60) days by the
Lessee, Lessor may remove, sell and destroy the same at the
expense of Lessee and Lessee hereby agrees to pay to Lessor the
reasonable cost of such removal, sale or destruction; or at the
option of Lessor, the title to said ships, vessels, barges,
hulls, debris, surplus and salvage materials not removed shall
become the property of Lessor without cost to Lessor and without
any payment to Lessee.

During any period of time employed by Lessee under this paragraph
to remove ships, vessels, barges, hulls, debris, surplus and
salvage materials, Lessee shall continue to pay the full rental
to Lessor in accordance with this lease which said rental shall
be prorated daily.

**40.** EQUAL EMPLOYMENT OPPORTUNITY:  Lessee shall not discriminate
against any employee or applicant for employment because of race,
color, religion, sex or national origin and shall take affirma-
tive action to assure applicants are employed and that employees
are treated during employment without regard to race, color,
religion, sex or national origin.  Except during the time Lessee
is exempt pursuant to written policy of Lessor, Lessee shall
submit to Lessor for review and approval a written affirmative
action program to attain improved employment for racial and
ethnic minorities and women and during the term of this lease
shall further make available employment records to Lessor upon
request.  Lessee shall certify in writing to Lessor that Lessee
is in compliance and throughout the term of this lease will
comply with Title VII of the Civil Rights Act of 1964, as
amended, the California Fair Employment Practices Act, and any

17600

**other** applicable Federal, State, and local law, regulation and **policy** (including without limitation those adopted by Lessor) **relating** to equal employment opportunity and affirmative action **programs**, including any such law, regulation, and policy herein- **after** enacted.

**Compliance** and performance by Lessee of the equal employment **opportunity** and affirmative action program provision of this **lease** is an express condition hereof and any failure by Lessee to **so comply** and perform shall be a default as provided in said **lease** and Lessor may exercise any right as provided therein and **as** otherwise provided by law.

**41.** ACKNOWLEDGMENT OF LESSOR'S IMPROVEMENTS:  Lessee agrees that **it has** examined the leased premises and the condition thereof, **that** the improvements thereon in their present condition are **satisfactory** and usable for Lessee's purposes and that no **representations** as to value or condition have been made by or on **behalf** of Lessor.



25

t. 17600

SAN DIEGO UNIFIED PORT DISTRICT
Document No. 14 0              2097
Filed   DEC 28 1984
        Office of the Clerk

42.  ABSTRACT OF LEASE:  This is the final paragraph and abstract of the lease dated *November 27*, 1984, between SAN DIEGO UNIFIED PORT DISTRICT, Lessor, and TELEDYNE INDUSTRIES, INC., acting by and through its Teledyne Ryan Aeronautical Division, Lessee, concerning the premises described in Exhibits "A" and "B", attached hereto and by this reference made a part hereof.

For good and adequate consideration, Lessor leases the premises to Lessee, and Lessee hires them from Lessor, for the term and on the provisions contained in the lease, including without limitation provisions prohibiting assignment, subleasing, and encumbering said lease without the express written consent of Lessor in each instance, all as more specifically set forth in said lease, which said lease is incorporated in this abstract by this reference.

The term is four (4) years, six (6) months beginning October 1, 1984, and ending March 31, 1989, with the option to extend this lease for seven (7) consecutive five (5) year additional periods.

This abstract is not a complete summary of the lease.  Provisions in the abstract shall not be used in interpreting the lease provisions.  In the event of conflict between the abstract and other parts of the lease, the other parts shall control.  Execution hereof constitutes execution of the lease itself.

APPROVED as to form                SAN DIEGO UNIFIED PORT DISTRICT
and legality

       OCT 17    , 1984       By _____
                                        ASSISTANT Port Director

Port Attorney                      TELEDYNE INDUSTRIES, INC., acting
                                   by and through its Teledyne Ryan
                                   Aeronautical Division

                                   By _____
JOSEPH D. PATELLO                     Title: C. E. McGill
Port Attorney                      Senior Vice President-Administration

RECORDING REQUESTED BY ☒

Please return to
District Clerk
San Diego Unified Port District
P.O. Box 488
  Diego, CA 92112

No Document Fee
Recordation for benefit of District

26

2098

STATE OF CALIFORNIA)
                              ss.
COUNTY OF SAN DIEGO)

On this 30th day of *NOVEMBER*, 1984, before me,
*SALLY LOMBARDO*, the undersigned
Notary Public, personally appeared
*GABRIEL J. GALLINA*.

_____✓_____ personally known to me
_____ proved to me on the basis of satisfactory
            evidence
to be the person who executed this instrument as
*ASSISTANT PORT DIRECTOR*
of the San Diego Unified Port District, a public corporation, and
acknowledged to me that the public corporation executed it.

WITNESS my hand and official seal.

OFFICIAL SEAL
SALLY LOMBARDO
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
My comm. expires MAY 17, 1987

*Sally Lombardo*

STATE OF CALIFORNIA )
                          ) ss.
COUNTY OF SAN DIEGO )

On this 26th day of October, 19 84 before me,
Lila L. Shedenhelm, the undersigned
Notary Public, personally appeared          C. E. McGill
,
____x_____ personally known to me
_____ proved to me on the basis of satisfactory
            evidence
to be the person who executed this instrument as _____
Senior Vice President-Administration
of Teledyne Ryan Aeronautical, a Division of Teledyne Industries,
Inc. and acknowledged to me that such corporation executed it.

WITNESS my hand and official seal.

My Commission expires 30, 1968

27

17600



EXHIBIT "A"

₵ RUNWAY 9/27
(N 74°00'00"W)

SAN DIEGO INTERNATIONAL AIRPORT
LINDBERGH FIELD

500'

5.500 CLEARANCE LINE      S74°00'00"E -1,570.37'
OBSTACLE LINE
516°00'00"W -
75.00'
DISTRICT TIDELANDS
S74°00'00"E
362.52'

BLDG. RESTRICTION LINE

DRAINAGE ESMT.

LEASE AREA
1,940,016 SQ.FT.
(44.54 AC.)

Δ=17°55'49"
R=2,146.50'
T=338.35'
L=671.56'

N60°31'00"W-735.00'

N'LY R/W LINE
SEWER ESMT.
S N06°26'49"W -1,445.55'

HARBOR     DRIVE

VACATED BY CITY OF S.D.
PER CITY COUNCIL RES.      (U.P.D. DOC NO. 71)
NO. 189562, 2-14-67.

GENERAL DYNAMICS
CORPORATION

SAN DIEGO BAY

NOTES:
1. LEASE AREAS SHOWN SHADED.
2. BEARINGS AND DISTANCES ARE "OLD TOWN"
3. CITY OF SAN DIEGO UTILITY EASEMENTS
   SHOWN HATCHED.

REVISED:

| DRAWN R. JOHNSON | SAN DIEGO UNIFIED PORT DISTRICT | DATE 20 AUG. 1984 |
| CHECKED BOURKE | TIDELAND LEASE | SCALE 1"=200' |
| REVIEWED C. STUCK | WITHIN CORPORATE LIMITS OF SAN DIEGO | REF. 1767-B, 1710, 2E-B.1 |
| APPROVED John E. Driehur CHIEF ENGINEER | TELEDYNE INDUSTRIES, INC. | DRAWING NO. 2608-B SHEET 2 OF 3 |

17600

NOTES:
1. LEASE AREAS SHOWN SHADED
2. BEARINGS AND DISTANCES ARE "OLD TOWN".
3. CITY OF SAN DIEGO UTILITY EASEMENTS SHOWN HATCHED.

REVISED:

| | | | |
|---|---|---|---|
| DRAWN R. JOHNSON | SAN DIEGO UNIFIED PORT DISTRICT | DATE 20 AUG. 1984 | |
| CHECKED BOURKE | TIDELAND LEASE | SCALE 1" = 200' | |
| REVIEWED C. STUCK | WITHIN CORPORATE LIMITS OF SAN DIEGO | REF. 1707-B, 1710, 2E-B | |
| APPROVED | TELEDYNE INDUSTRIES, INC. | DRAWING NO. 2608-B | |
| CHIEF ENGINEER | | SHEET 3 OF 3 | |

17600

Commencing at the intersection of the southwesterly prolongation of the
southeasterly right of way line of Sutherland Street in the City of San
Diego with the southerly 500.00 foot clearance line of Runway 9-27, San
Diego International Airport, Lindbergh Field; thence along said 500.00
foot clearance line south 74°00'00" east a distance of 1,179.41 feet to
the TRUE POINT OF BEGINNING; thence continuing along said southerly
500.00 foot clearance line south 74°00'00" east a distance of 1,570.37
feet; thence leaving said southerly 500.00 foot clearance line south
16°00'00" west a distance of 75.00 feet; thence south 74°00'00" east
a distance of 382.52 feet to a point on a line which lies parallel to and
distant 500.00 feet southwesterly from the center line of Runway 13-31;
thence along said 500.00 foot parallel line south 35°10'10" east a distance
of 991.78 feet to a point on a curve concave to the north having a radius
of 1,265.00 feet, the center of which bears north 2°29'50" east; thence
leaving said 500.00 foot parallel line and westerly along the arc of said
curve through a central angle of 1°19'52" an arc distance of 29.39 feet
to a point which bears south 3°49'42" west from the center of said 1,265.00
foot radius curve; thence south 15°39'16" west a distance of 9.43 feet;
thence north 78°45'44" west a distance of 36.00 feet; thence south
11°14'16" west a distance of 30.00 feet to a point on the northerly right
of way line of Harbor Drive, as said Harbor Drive was established as and
for a public street by the Documents of Conveyance on file in the Office
of the District Clerk as Document No. 71, subsequently portions of said
Harbor Drive were vacated by City of San Diego Resolution No. 189562,
February 14, 1967, said point also being on a curve concave to the north
having a radius of 1,300.00 feet, the center of which bears north 5°39'28"
east; thence along the said northerly right of way line of Harbor Drive as
established by said Document No. 71, and westerly along the arc of said
curve through a central angle of 15°49'32" an arc distance of 359.07 feet
to a point which bears south 21°29'00" west from the center of said 1,300.00
foot radius curve; thence tangent to said 1,300.00 foot radius curve north
68°31'00" west a distance of 735.00 feet to the beginning of a tangent
curve concave to the south having a radius of 2,148.50 feet; thence westerly
along the arc of said curve through a central angle of 17°55'49" an arc
distance of 672.36 feet; thence tangent to said 2,148.50 foot radius curve
north 86°26'49" west a distance of 1,445.35 feet to the beginning of a
tangent curve concave to the northeast having a radius of 50.00 feet;
thence leaving said northerly right of way line of Harbor Drive and
northerly along the arc of said curve through a central angle of 108°46'36"
an arc distance of 94.93 feet to a point on the easterly right of way
line of Winship Lane; thence tangent to said 50.00 foot radius curve

SHEET 1 OF 2

REVISED:

| DRAWN RWJ/lsf | | DATE August 20, 1984 |
|---|---|---|
| CHECKED JWP | SAN DIEGO UNIFIED PORT DISTRICT | SCALE |
| REVIEWED C. STUCK | TIDELAND LEASE | REF. |
| APPROVED | Within Corporate Limits of San Diego | DRAWING NO. |
| John E Bruchan CHIEF ENGINEER | TELEDYNE INDUSTRIES, INC. | 2608-B |

17600

EXHIBIT "B"

and along the said easterly right of way line of Winship Lane north 22°19'47"
east (north 22°18'46" east - record) a distance of 316.87 feet; thence
leaving said easterly right of way line of Winship Lane south 73°51'09" east
a distance of 445.24 feet; thence north 22°19'47" east a distance of 54.68
feet; thence north 74°00'00" west a distance of 82.71 feet; thence north
16°00'00" east a distance of 83.57 feet; thence south 74°00'00" east a
distance of 149.59 feet; thence north 16°00'00" east a distance of 105.60
feet; thence north 8°59'04" west a distance of 66.84 feet; thence north
22°19'47" east a distance of 372.89 feet to the TRUE POINT OF BEGINNING,
containing 1,940,016 square feet or 44.54 acres of tideland area.

The above described area is that delineated on Drawing No. 2608-B, dated
20 August 1984, and made a part of this agreement.

SHEET 2 OF 2

| | |
|---|---|
| REVISED: | |

| | SAN DIEGO UNIFIED PORT DISTRICT | |
|---|---|---|
| DRAWN RWJ/lsf | TIDELAND LEASE | DATE August 20, 1984 |
| CHECKED JWP | | SCALE |
| REVIEWED C. STUCK | Within Corporate Limits of San Diego | REF. |
| APPROVED | TELEDYNE INDUSTRIES, INC. | DRAWING NO. |
| John E Davies | | 2608-B |
| CHIEF ENGINEER | | |

17600

and along the said easterly right of way line of Winship Lane north 22°19'47"
east (north 22°18'46" east - record) a distance of 316.87 feet; thence
leaving said easterly right of way line of Winship Lane south 73°51'09" east
a distance of 445.24 feet; thence north 22°19'47" east a distance of 54.68
feet; thence north 74°00'00" west a distance of 82.71 feet; thence north
16°00'00" east a distance of 83.57 feet; thence south 74°00'00" east a
distance of 149.59 feet; thence north 16°00'00" east a distance of 105.60
feet; thence north 8°59'04" west a distance of 66.84 feet; thence north
22°19'47" east a distance of 372.89 feet to the TRUE POINT OF BEGINNING,
containing 1,940,016 square feet or 44.54 acres of tideland area.

The above described area is that delineated on Drawing No. 2608-B, dated
20 August 1984, and made a part of this agreement.

SHEET 2 OF 2

| | |
|---|---|
| REVISED: | |
| DRAWN RWJ/lsf  CHECKED JWP  REVIEWED C. STUCK  APPROVED _John E Swick_  CHIEF ENGINEER | **SAN DIEGO UNIFIED PORT DISTRICT**  TIDELAND LEASE  Within Corporate Limits of San Diego  TELEDYNE INDUSTRIES, INC. |

DATE August 20, 198_
SCALE
REF.

DRAWING NO.
2608-B

L. 17600

REFERENCE
COPY

SAN DIEGO UNIFIED PORT DISTRICT

ORDINANCE 1089

AN ORDINANCE GRANTING A LEASE TO
TELEDYNE INDUSTRIES, INC.,
ACTING BY AND THROUGH ITS
TELEDYNE RYAN AERONAUTICAL DIVISION

The Board of Port Commissioners of the San Diego Unified Port District does ordain as follows:

Section 1.  That lease agreement between the San Diego Unified Port District and Teledyne Industries, Inc., Acting By and Through its Teledyne Ryan Aeronautical Division, on file in the office of the District Clerk as Document No. 17600 , leasing certain premises located on Harbor Drive in the City of San Diego, is hereby approved and granted.

Section 2.  The Port Director or his authorized representative is hereby directed to execute the said lease agreement with Teledyne Industries, Inc., Acting By and Through its Teledyne Ryan Aeronautical Division, on behalf of the District.

Section 3.  This ordinance shall take effect on the 31st day from its publication.

Presented By:    DON L. NAY, Port Director

By _____
          ASSISTANT PORT DIRECTOR

Approved:    JOSEPH D. PATELLO, Port Attorney

_____

SW
11/20/84

REFERENCE
COPY
#1760C

Re Rental Review - Teledyne )
)
Industries, Inc. . . . . . . . . . )

RESOLUTION 89-251

BE IT RESOLVED by the Board of Port Commissioners of the
San Diego Unified Port District, as follows:

That the rental covering the tenancy of Teledyne Industries,
Inc., acting by and through its Teledyne Ryan Aeronautical Division,
under lease dated 27 November 1984 for premises located on Harbor
Drive in the City of San Diego, is hereby established for the
Five (5) year rental review period commencing 1 April 1989 and
ending 31 March 1994, as follows:  The sum of Thirty Eight Thousand
One Hundred Fifty Four Dollars ($38,154.00) per month calculated
on the basis of Twenty Three and Six Tenths (23.6) Cents per square
foot per year for the land area; provided, however, said rent
is subject to adjustment upward or downward after the first Thirty
(30) months of such rental review period in accordance with the
computation based on the Consumer Price Index for All Urban Con-
sumers for Los Angeles/Long Beach/Anaheim, CA/All Items as pro-
vided in Paragraph 2(c) of the lease between the parties.  In
accordance with Paragraph 2(e)bb) of said lease, Teledyne Industries,
Inc. shall pay the District the sum of Thirty Thousand Two Hundred
Eleven Dollars ($30,211.00) per month, commencing April 1, 1989,
for Lessor-owned improvements.

ADOPTED this 22nd day of ____August____, 1989.

Presented By:   DON L. NAY, Port Director

By _____
   ASSISTANT PORT DIRECTOR

Approved:   JOSEPH D. PATELLO, Port Attorney

sw
8/17/89

REFERENCE
COPY

Re Rental Review - Teledyne        )
                                   )
Industries, Inc. . . . . . . . . . . . . )

**17600**

RESOLUTION  95-229

BE IT RESOLVED by the Board of Port Commissioners of the San Diego Unified Port District, as follows:

That the rental covering the tenancy of Teledyne Industries, Inc., acting by and through its Teledyne Ryan Aeronautical Division, for premises located on Harbor Drive in the City of San Diego, under lease dated 27 November 1984, is hereby established for the Five (5) year rental review period commencing 1 April 1994 and ending 31 March 1999, as follows:  The sum of Fifty Three Thousand Three Hundred Fifty Dollars ($53,350.00) per month calculated on the basis of Thirty Three (33) Cents per square foot per year for the land area; provided, however, said rent is subject to adjustment upward or downward after the first Thirty (30) months of such rental review period in accordance with the computation based on the Consumer Price Index for All Urban Consumers for Los Angeles/Long Beach/Anaheim, CA/All Items, as provided in Paragraph 2(c) of the lease between the parties. In accordance with Paragraph 2(e)bb) of said lease, Teledyne Industries, Inc. shall continue to pay to the District the sum of Thirty Thousand Two Hundred Eleven Dollars ($30,211.00) per month for Lessor-owned improvements.

ADOPTED this  25th  day of  July        , 1995.

Presented By:        LAWRENCE M. KILLEEN
                     Port Director

                     By _____
                        ASSISTANT PORT DIRECTOR

Approved:            JOSEPH D. PATELLO, Port Attorney

sw
7/19/95

EXHIBIT C

PROPERTY FILE RECORD

FILE No. 97A-015

ROUTE TO:

1. ACCT. X  PROP. B 2
           2. ENG.

RETURN AS SOON AS POSSIBLE

Document No. 35087

Filed November 27, 1996
SD UNIFIED PORT DISTRICT Clerk's Office

### AGREEMENT FOR AMENDMENT OF LEASE
### AMENDMENT NO. 1

THIS AGREEMENT, made and entered into this 29th day of October, 1996, by and between the SAN DIEGO UNIFIED PORT DISTRICT, a public corporation, hereinafter called "Lessor," and TELEDYNE INDUSTRIES, INC., a California corporation, hereinafter called "Lessee," WITNESSETH:

WHEREAS, Lessor and Lessee, heretofore on the 27th day of November, 1984, entered into a Lease of certain tidelands in the city of San Diego, California, which Lease is on file in the Office of the Clerk of Lessor bearing Document No. 17600; and

WHEREAS, Lessor and Lessee are mutually desirous of amending said Lease;

NOW THEREFORE, for valuable consideration, said Lease is hereby amended in the following respects and no others, and except as expressly amended, all terms, covenants and conditions of said Lease shall remain in full force and effect:

A. The description of the premises contained in the preamble of said Lease is amended to read as follows:

Approximately 1,948,012 square feet of tideland area located at 2701 North Harbor Drive in the city of San Diego, California, more particularly delineated and described on Drawing No. 008-010, dated November 15, 1995, attached hereto as Exhibits "A" and "B" and by this reference made a part hereof.

B. Said Lease is also hereby amended by deleting therefrom Paragraph 2 in its entirety and substituting in lieu thereof Paragraph 2 as follows:

2. RENTAL: Lessee agrees to pay to Lessor rent in accordance with the following schedules and procedures:

(a) The term of this lease shall be divided into a series of rental periods. The first such rental period consists of fifty-four (54) months and each successive rental period consists of sixty (60) months. Each successive rental period shall commence at the expiration of the immediately preceding rental period.

RECEIVED
FINANCE
INTEROFFICE MAIL

FEB 27 1997
PM

1

(b)  **The ground rent for the first rental period, commencing October 1, 1984 and ending March 31, 1989, shall be Nine Thousand Seven Hundred Six Dollars ($9,706) per month.**  The ground rent for the second rental period, commencing April 1, 1989 and ending March 31, 1994, shall be a sum per month agreed upon by Lessor and Lessee.  In the event the parties cannot agree to the ground rent for the second rental period, the ground rent shall be 25% of the amount established pursuant to the provisions of paragraph 2(d).  The ground rent for the third rental period, commencing April 1, 1994 and ending March 31, 1999, shall be a sum per month agreed upon by Lessor and Lessee; provided, however, that commencing on the first day of the month following receipt of written notice from Lessor that construction of the expansion of Lessee's parking lot on Harbor Drive has been completed, ground rent shall be Fifty Three Thousand Five Hundred Seventy Dollars ($53,570) per month.  In the event the parties cannot agree to the ground rent for the third rental period, the ground rent shall be 50% of the amount established pursuant to the provisions of paragraph 2(d); provided, however, that during the second and third rental periods the ground rents, whether established by agreement of the parties or pursuant to an arbitration award, shall be adjusted upward or downward after the expiration of the first thirty (30) months of each rental period pursuant to the provisions of paragraph 2(c).

(c)  For the fourth and subsequent rental periods, the ground rent shall be a sum per month agreed upon by Lessor and Lessee.  In the event the parties cannot agree to the ground rent for such periods, the ground rent shall be the amount established pursuant to the provisions of paragraph 2(d); provided, however, that during the second and all subsequent rental periods the ground rents, whether established by agreement of the parties or pursuant to an arbitration award, shall be adjusted upward or downward after the expiration of the first thirty (30) months thereof (the adjustment date) according to the following computation:  "The base figure for computing the adjustment is the arithmetic average of the three monthly index figures for the sixth, fifth, and fourth months immediately preceding the existing rental period as shown in the Consumer Price Index for All Urban Consumers for Los Angeles/Anaheim/Riverside, CA/All Items based on the period 1982-84 = 100, as published by the United States Department of Labor's Bureau of Labor Statistics.  The index figure for the adjustment date is the arithmetic average of the three monthly index figures of said Consumer Price Index for All Urban Consumers for the sixth, fifth, and fourth months immediately preceding the adjustment date.

**"The index for the adjustment date shall be computed as a percentage of the base figure.  For example, assuming the base figure is 110 and the index figure for the adjustment is 121, the percentage to be applied is 121/110 = 1.10 = 110%.**

**"That percentage of the base figure shall be applied to the initial rent in effect at the beginning of the then existing rental period and will continue for the remaining 30 months of the rental period. Notwithstanding the foregoing, the percentage of the base figure shall be applied to the sum of Fifty-Three Thousand Five Hundred Seventy Dollars ($53,570) per month for the adjustment during the third rental period.**

**"In the event the Consumer Price Index for All Urban Consumers of Los Angeles/Anaheim/Riverside, CA/All Items is no longer published, the index for the adjustment date shall be the one reported in the U.S. Department of Labor's comprehensive official index most nearly matching the foregoing description of the index.  If an index is calculated from a base different from the base period 1982-84 = 100, the base figure used for calculating the adjustment percentage shall first be converted under a formula supplied by the Bureau.**

**"If the above-described Department of Labor indices are no longer published, another index generally recognized as authoritative shall be substituted by agreement of the parties.  If they are unable to agree within 60 days after demand by either party, a substitute index will be selected by the Chief Officer of the San Francisco Regional Office of the Bureau of Labor Statistics or its successor.**

**"Notwithstanding the publication dates of the index, the effective date of the rent adjustment is at the expiration of the first 30 months of each rental period. Until said rent adjustment can be reasonably determined by index publication, Lessee shall continue to make rental payments pursuant to this lease at the same rent in effect at the then existing rental period.  Because of this provision, overpayment of rents shall be credited to the Lessee's rental account and under-payments of rent shall be immediately paid to the Lessor."**

(d)   In the event the parties cannot agree to the ground rent for a rental period, the controversy as to rent for said period shall be determined by three arbitrators.  After notice by either party to the other requesting arbitration, one arbitrator shall be appointed by each party.  Notice of the appointment shall be given by each party to the other when made.  The two arbitrators shall

3

immediately choose a third arbitrator to act with them.
If they fail to select a third arbitrator, on
application by either party, the third arbitrator shall
be promptly appointed by the then presiding judge of the
Superior Court of the State of California, County of
San Diego, acting in his individual capacity.  The party
making the application shall give the other party notice
of his application.  All of the arbitrators shall be
qualified real estate appraisers.  Each party shall bear
the expense of its own appointed arbitrator and shall
bear other expenses pursuant to Section 1284.2 of the
Code of Civil Procedure of California.  Hearings shall
be held in the City of San Diego, California.  The award
shall be the decision of not less than two of the
arbitrators.  Said award shall be the rent which Lessor
could derive from Lessor's property if it were vacant
and made available on the open market for new leasing
purposes at the commencement of the rental period under
arbitration.  For the purpose of this arbitration
procedure, the arbitrators shall assume that the Lessor
has a fee simple absolute estate.  In determining what
rent Lessor could derive from said property if it were
made available on the open market for new leasing
purposes, the arbitrators shall consider the property as
if it were available to be leased for industrial uses.
In determining the rates, returns, rents, and/or
percentage rentals for said use and/or uses, the
arbitrators shall use and analyze only that market data
that is found in the open marketplace, such as is
demanded and received by other Lessors, for the same or
similar uses as the arbitrators are required to
consider.  In determining said rent, the arbitrators
shall disregard the proximity of the leased premises to
San Diego International Airport.  In all cases, the
award shall be based upon recognized real estate
appraisal principles and methods, subject to the
limitation that the arbitrators shall disregard the
proximity of the leased premises to San Diego
International Airport.  The award determined by the
arbitrators shall be effective and retroactive to the
first day of the rental period under arbitration.  The
award shall be in writing in the form of a report that
is in accordance with the powers of the arbitrators
herein, supported by facts and analysis and in
accordance with law.  The arbitrators shall make copies
of their report available to any ethical practice
committee of any recognized professional real estate
organization.  The arbitration shall be conducted under
and subject to Section 1280 through 1294.2 of the Code
of Civil Procedure of California.

(e)  In addition to the ground rental provided for in
     sections 2(a), (b) and (c), Lessee agrees to pay Lessor
     rent for Lessor-owned improvements located on the leased

4

premises in accordance with the schedules and
procedures:

(1)  The sum of Three Thousand Five Hundred Dollars
     ($3,500) per month for the first rental period
     commencing on the effective date of this lease.
     Said sum shall be due and payable in advance on or
     before the initial term of the lease.

(2)  The sum of Thirty Thousand Two Hundred Eleven
     Dollars ($30,211) per month commencing April 1,
     1989 and continuing for the entire remaining term
     of the lease including options.  Said sum shall be
     due and payable on or before the tenth day of each
     month during the remaining term of the lease.  Said
     sum shall not be subject to adjustment during the
     remaining term of the lease nor shall it be
     considered in establishing the ground rentals as
     provided for in section 2(d) above.

(f)  In the event Lessee is delinquent in rendering to Lessor
     an accounting of rent due or in remitting the rent due
     in accordance with the rental provisions of this lease,
     then the rent not paid when due shall bear interest at
     the rate of Ten Percent (10%) per annum from the date
     due until paid.  Provided, however, that the Executive
     Director of Lessor shall have the right to waive for
     good cause any interest payment upon written application
     of Lessee for any such delinquency period.

(g)  Rentals shall be delivered to the Treasurer of the
     San Diego Unified Port District at P.O. Box 488,
     San Diego, California 92112.  The designated place of
     payment may be changed at any time by Lessor upon ten
     (10) days' written notice to Lessee.  Lessee assumes all
     risk of loss if payments are made by mail.



## ABSTRACT OF LEASE AMENDMENT

C.   ABSTRACT OF LEASE AMENDMENT NO. 1:  This is the final paragraph
and abstract of Lease Amendment No. 1, dated OCTOBER 29TH,1996 between
SAN DIEGO UNIFIED PORT DISTRICT, Lessor, and TELEDYNE INDUSTRIES,
INC., Lessee, concerning the premises described in Exhibits "A" and
"B", attached hereto and by this reference made a part hereof.

For good and adequate consideration, Lessor leases the premises to
Lessee, and Lessee hires them from Lessor, for the term and on the
provisions contained in Lease dated November 27, 1984, recorded by
the San Diego County Recorder's Office as Document No. 84-457233, as
amended by this Lease Amendment No. 1, dated OCTOBER 29TH, 1996,
including, without limitation, provisions prohibiting assignment,
subleasing, and encumbering the leasehold without the express written
consent of Lessor in each instance, all as more specifically set
forth in said Lease and said Amendment, which are incorporated in
this abstract by this reference.

The term is four (4) years, six (6) months beginning October 1, 1984
and ending on March 31, 1989, with options to extend this lease for
seven (7) consecutive five (5) year additional periods.  This Lease
Amendment No. 1 shall become effective as of February 1, 1996.

This abstract is not a complete summary of the Lease Amendment.
Provisions in the abstract shall not be used in interpreting the
Lease Amendment provisions.  In the event of conflict between the
abstract and other parts of the Lease Amendment, the other parts
shall control.  Execution hereof constitutes execution of the Lease
Amendment itself.

APPROVED                                SAN DIEGO UNIFIED PORT DISTRICT

_____ ,19 96                  By _____
        APR 1 5                              ASSISTANT  Executive Director
                                             DONALD E. HILLMAN, JR

Port Attorney                           TELEDYNE INDUSTRIES, INC.

By _____                      By _____
                                           Title:  Donald J. Wilkins
                                                   General Counsel

6

**(FOR USE BY SAN DIEGO UNIFIED PORT DISTRICT)**

STATE OF CALIFORNIA)

COUNTY OF SAN DIEGO)

On _____November 4th, 1996_____ before me,

_____Timothy A. Deuel, Notary Public_____, personally appeared

_____Donald E. Hillman, Jr._____ _____, personally known

to me ~~(or proved to me on the basis of satisfactory evidence)~~ to be

the person~~(s)~~ whose name~~(s)~~ is~~/are~~ subscribed to the within

instrument and acknowledged to me that he~~/she/they~~ executed the same

in his~~/her/their~~ authorized capacity~~(ies)~~, and that by his~~/her/their~~

signature~~(s)~~ on the instrument ~~the person(s), or~~ the entity upon

behalf of which the person~~(s)~~ acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

TIMOTHY A. DEUEL
COMM. # 1038251
Notary Public — California
SAN DIEGO COUNTY
My Comm. Expires SEP 8, 1998





SAN DIEGO INTERNATIONAL AIRPORT
LINDBERGH FIELD

DISTRICT

₵ RUNWAY 9/27
(N74°00'00"W)

500'

S74°00'00"E-1,570.37'
S-500 CLEARANCE LINE
OBJECT FREE LINE

TIDELANDS

BLDG. RESTRICTION LINE

1,948,012 SQ. FT.
(44.72 ACRES)

MATCH LINE — SEE SHEET NO. 1

MATCH LINE SHEET NO. 3

DRAINAGE
ESMT.

SEWER
ESMT.

Δ=17°55'49"
R=2,148.50'
T=338.95'
L=672.36'

N86°26'49"W-574.06'

N68°31'00"W-735.00'

NORTH   HARBOR   DRIVE
(U.P.D. DOC. NO. 71)

VACATED BY CITY OF S.D.
COUNCIL RES NO. 189562

46'
200'
46'

GENERAL DYNAMICS CORP.
007-029

N33°31'11"E

008-001
SAN DIEGO BAY

S.D.U.P.D. LIMITS
S27°29'00"W

U.S. COAST GUARD
BASE

NOTES:
1. LEASE AREA SHOWN SHADED.
2. BEARINGS & DISTANCES ARE
   U.S. COAST & GEODETIC "OLD TOWN".
3. CITY OF SAN DIEGO UTILITY EASEMENTS SHOWN HATCHED.

| DRAWN | JFD |
|-------|-----|
| CHECKED | BOWKER |
| REVIEWED | |
| APPROVED | |

DIRECTOR OF ENGINEERING

SAN DIEGO UNIFIED PORT DISTRICT
TIDELAND LEASE
WITHIN CORPORATE LIMITS OF SAN DIEGO

TELEDYNE INDUSTRIES, INC.

DATE   15 NOVEMBER 1995
SCALE   1"=200'
REF.   260B-B, 2E-8,12

DRAWING NO.
008-010
SHEET 2 OF 3



Commencing at the intersection of the southwesterly prolongation of the
southeasterly right of way line of Sutherland Street in the City of San Diego
with a line which lies parallel with and distant 500.00 feet southwesterly
from the center line of Runway 9-27, San Diego International Airport,
Lindbergh Field; thence along said 500.00 foot parallel line south 74°00'00"
east a distance of 1,179.41 feet to the TRUE POINT OF BEGINNING; thence
continuing along said parallel line south 74°00'00" east a distance of
1,570.37 feet; thence leaving said 500.00 foot parallel line of Runway 9-27
south 16°00'00" west a distance of 75.00 feet; thence south 74°00'00" east a
distance of 382.52 feet to a point on a line which lies parallel with and
distant 500.00 feet southwesterly from the center line of Taxiway D; thence
along said 500.00 foot parallel line south 35°10'10" east a distance of 991.78
feet to a point on a curve concave to the north having a radius of 1,265.00
feet, the center of which bears north 2°29'50" east; thence leaving said
500.00 foot parallel line of Taxiway D and westerly along the arc of said
curve through a central angle of 1°19'52" an arc distance of 29.39 feet to a
point which bears south 3°49'42" west from the center of said 1,265.00 foot
radius curve; thence south 15°39'16" west a distance of 9.43 feet; thence
north 78°45'44" west a distance of 36.00 feet; thence south 11°14'16" west a
distance of 30.00 feet to a point on the northerly right of way line of North
Harbor Drive, as said North Harbor Drive was established as and for a public
street by the Documents of Conveyance on file in the Office of the District
Clerk as Document No. 71, dated February 13, 1963, subsequently portions of
said North Harbor Drive were vacated by City of San Diego Resolution No.
189562, adopted February 14, 1967, said point also being on a curve concave to
the north having a radius of 1,300.00 feet, the center of which bears north
5°39'28" east; thence along said northerly right of way line of North Harbor
Drive as established by said Document No. 71, and westerly along the arc of
said curve through a central angle of 15°49'32" an arc distance of 359.07 feet
to a point which bears south 21°29'00" west from the center of said 1,300.00
foot radius curve; thence tangent north 68°31'00" west a distance of 735.00
feet to the beginning of a tangent curve concave to the south having a radius
of 2,148.50 feet; thence westerly along the arc of said curve through a
central angle of 17°55'49" an arc distance of 672.36 feet to a point which
bears north 3°33'11" east from the center of said 2,148.50 foot radius curve;
thence north 86°26'49" west a distance of 574.06 feet; thence leaving said
northerly right of way line of North Harbor Drive south 3°33'11" west a
distance of 12.61 feet to the beginning of a tangent curve concave to the
northwest having a radius of 20.00 feet; thence southwesterly along the arc of
said curve through a central angle of 92°47'05" an arc distance of 32.39 feet
to a point which bears south 6°20'16" west from the center of said 20.00 foot
radius curve; thence north 83°39'44" west a distance of 382.56 feet; thence

Page 1 of 2

REVISED:

| | | | |
|---|---|---|---|
| DRAWN JFD/NP | | DATE 15 Nov. 1995 |
| CHECKED BOURKS | SAN DIEGO UNIFIED PORT DISTRICT | SCALE |
| REVIEWED | TIDELAND LEASE | REF. 6012inp |
| APPROVED Marino W. Bail | Within Corporate Limits of San Diego | DRAWING NO. |
| DIRECTOR OF ENGINEERING | TELEDYNE INDUSTRIES, INC. | 008-010 |

north 86°26'49" west a distance of 47.97 feet; thence north 16°19'50" east a
distance of 14.36 feet to a point on the said northerly right of way line of
North Harbor Drive; thence along said northerly right of way line north
86°26'49" west a distance of 409.57 feet to the beginning of a tangent curve
concave to the northeast having a radius of 40.00 feet, said point also being
a point on the easterly right of way line of Winship Lane realigned; thence
leaving said northerly right of way line of North Harbor Drive and along said
easterly right of way line of Winship Lane northwesterly along the arc of said
curve through a central angle of 90°00'00" an arc distance of 62.83 feet to a
point which bears north 86°26'49" west from the center of said 40.00 foot
radius curve; thence north 3°33'11" east a distance of 39.78 feet to the
beginning of a tangent curve concave to the southeast having a radius of
294.00 feet, the center of which bears south 86°26'49" east; thence north-
easterly along the arc of said curve through a central angle of 18°46'36" an
arc distance of 96.35 feet to a point which bears north 67°40'13" west from
the center of said 294.00 foot radius curve; thence continuing along said
easterly right of way line of Winship Lane north 22°19'47" east (north
22°18'46" east - record) a distance of 202.47 feet; thence leaving said
easterly right of way line of Winship Lane south 73°51'09" east a distance of
445.24 feet; thence north 22°19'47" east a distance of 54.68 feet; thence
north 74°00'00" west a distance of 82.71 feet; thence north 16°00'00" east a
distance of 83.57 feet; thence south 74°00'00" east a distance of 149.59 feet;
thence north 16°00'00" east a distance of 105.60 feet; thence north 8°59'04"
west a distance of 66.84 feet; thence north 22°19'47" east a distance of
372.89 feet to the TRUE POINT OF BEGINNING, containing 1,948,012 square feet
or 44.72 acres of tideland area.

The above described area is that delineated on Drawing No. 008-010, dated 15
November 1995, and made a part of this agreement.

Page 2 of 2

REVISED:

| | |
|---|---|
| DRAWN JFD/NP | |
| CHECKED *BOU/REC* | |
| REVIEWED *MM* | |
| APPROVED | |
| DIRECTOR OF ENGINEERING | |

**SAN DIEGO UNIFIED PORT DISTRICT**
TIDELAND LEASE
Within Corporate Limits of San Diego

TELEDYNE INDUSTRIES, INC.

DATE 15 Nov. 1995
SCALE
REF. 6012inp

DRAWING NO.
008-010

*Finance*

PROPERTY FILE RECORD
FILE No. 98 - 220
ROUTE TO:
DEV.
1. ACCT. N/A  2. SVCS. N/A
RETURN AS SOON AS POSSIBLE

Document No. __38301__

Filed __DEC 0 3 1998__
SD UNIFIED PORT DISTRICT Clerk's Office

## TIDELAND USE AND OCCUPANCY PERMIT

THIS PERMIT, granted this 18th day of November, 1998, by the SAN DIEGO UNIFIED PORT DISTRICT, a public corporation, hereinafter called "District," to TELEDYNE RYAN AERONAUTICAL, a division of Teledyne Industries, Inc., a California corporation, hereinafter called "Tenant," WITNESSETH:

District for the considerations hereinafter set forth, hereby grants to Tenant upon the terms and conditions and for the purposes and uses hereinafter set forth, the right to use and occupy a portion of those lands conveyed to the San Diego Unified Port District by that certain Act of the Legislature of the State of California, entitled "San Diego Unified Port District Act," Stats. 1962, 1st Ex. Sess., c. 67, as amended, which lands are more particularly described as follows:

> Approximately 138 parking spaces adjacent to 2701 North Harbor Drive located on District tidelands in the city of San Diego, California, more particularly delineated on Drawing No. 007-032, revised August 27, 1996, attached hereto and by this reference made a part hereof.

This Permit is granted upon the following terms and conditions:

1.   **TERM:** The term of this Permit shall be for five (5) years, commencing on the 1st day of October, 1998, and ending on the 30th day of September, 2003, unless sooner terminated as herein provided.

2.   **RENTAL:** As and for the rental, Tenant agrees to pay to District the sum of Five Thousand Five Hundred Twenty Dollars ($5,520) per month, payable in advance on or before the first (1st) day of each and every month during the term of this Permit.

2.1   **COST OF LIVING RENT ADJUSTMENTS:**

(a)   This Permit shall provide for the following mid-term Rental Period adjustment date, hereinafter called "Adjustment Date":

April 1, 2001

1

(b)     On the referenced Adjustment Date, the rent specified in Paragraph 2 herein shall be adjusted by the increase, if any, in the Consumer Price Index for All Urban Consumers for Los Angeles/Anaheim/Riverside, CA/All Items based on the period 1982-84 = 100 as published by the United States Department of Labor's Bureau of Labor Statistics, hereinafter called "CPI".

The monthly rent payable pursuant to Paragraph 2 of this Permit shall be multiplied by a fraction, the numerator of which shall be the CPI of the calendar month three months prior to the calendar month during which the adjustment is to take effect, and the denominator of which shall be the CPI for the first calendar month of the then-current Rental Period. The sum so calculated shall constitute the new monthly rent herein but in no event shall such new monthly rent be less than the monthly rent payable for the month preceding said Adjustment Date.

In the event the CPI is no longer published, the index for the Adjustment Date shall be the one reported in the U. S. Department of Labor's comprehensive official index most nearly corresponding to the foregoing description of the CPI. If the herein-described Department of Labor indices are no longer published, another index generally recognized as authoritative shall be substituted by agreement of the parties. If they are unable to agree within sixty (60) days after demand by either party, a substitute index will be selected by the Chief Officer of the San Francisco Regional Office of the Bureau of Labor Statistics or its successor.

Notwithstanding the publication dates of the CPI, the rent shall be adjusted to be effective on the Adjustment Date. Until said rent adjustment can be reasonably determined by CPI publication, Tenant shall continue to make rent payments pursuant to this Permit at the same rent in effect at the then-current Rental Period. Because of this provision, underpayments of rent shall be immediately paid to District.

Tenant hereby acknowledges that late payment by Tenant to District of rent and other sums due hereunder will cause District to incur costs not contemplated by this Permit. Accordingly, in the event Tenant is delinquent in remitting the rent due in accordance with the rent provisions of this Permit, Tenant shall pay, in addition to the unpaid rent, five percent (5%) of the delinquent rent. If rent is still unpaid at the end of fifteen (15) days, Tenant shall pay an additional five percent (5%) [being a total of ten percent (10%)]. The parties hereby agree that said late charges are appropriate to compensate District for loss resulting from rent delinquency including, without limitation, lost interest, opportunities, legal costs, and the cost of servicing the delinquent account. Acceptance of such late charges and any portion of the late payment by District shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent District from exercising any of its other rights and remedies. The Executive Director of District shall have the right to waive for good cause any late charges upon written application of Tenant for any such delinquency period.

2

All payments by Tenant to District shall be by a good and sufficient check. No payment made by Tenant or receipt or acceptance by District of a lesser amount than the correct amount of rent due under this Permit shall be deemed to be other than a payment on account of the earliest rent due hereunder, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and District may accept such check or payment without prejudice to District's right to recover the balance or pursue any other available remedy.

All payments shall be delivered to the Treasurer of the District. Checks shall be made payable to the Treasurer and mailed to the Office of the Treasurer, San Diego Unified Port District, Post Office Box 120488, San Diego, California 92112-0488, or delivered to the Office of the Treasurer, 3165 Pacific Highway, San Diego, California. The designated place of payment and filing may be changed at any time by District upon ten (10) days' written notice to Tenant. Tenant assumes all risk of loss and responsibilities for late charges if payments are made by mail.

3.    USE: The above-described premises shall be used only and exclusively for the purpose of gratuitous parking of automobiles of Tenant's employees, government employees, customers, vendors, and visitors to Tenant's adjacent plant, which parking spaces may be designated for exclusive use by specific individuals or groups of individuals falling within the aforementioned categories, and for no other purpose whatsoever without the prior written consent of the Executive Director of District in each instance.

4.    ASSIGNMENT-SUBLEASE-ENCUMBRANCE: Tenant shall not encumber this Permit, the premises thereof and the improvements thereon by a deed of trust, mortgage, or any other security instrument without the express written consent of the District, evidenced by resolution first had and obtained in each instance. Furthermore, neither the whole nor any part of the rented premises nor any of the rights or privileges granted by this Permit shall be assignable or transferable in any way without such consent. Nor shall Tenant grant any permission to any other person to occupy any portion of the rented premises without such consent. Any such purported assignment, transfer, sublease, encumbrance, or permission given without such consent shall be void as to District.

5.    CHANGES OR ALTERATIONS: Tenant shall make no changes or alterations in the above-described premises, nor make, erect, or install any buildings, structures, signs, machines, or other improvements on the premises without the consent in writing of the Executive Director of District. Tenant further agrees to provide the proper containers for trash and to keep the premises free and clear of rubbish, debris, and litter at all times.

3

6.   **MAINTENANCE:**  Tenant hereby agrees that the premises are in a good and tenantable condition, that Tenant will take good care of the premises and appurtenances, including any personal property belonging to District; and that Tenant, as a part of the consideration for rental stated above, will at Tenant's sole cost and expense keep and maintain said premises, appurtenances, and personal property in good and sanitary condition and repair during the term of this Permit, subject to normal and ordinary wear and tear resulting from the use of the above-described premises as herein provided.  District shall at no time during the term of this Permit be required to make any improvements or repairs to the above-described premises.

7.   **TITLE TO IMPROVEMENTS:**  On the commencement date of the term of this Permit, all existing structures, buildings, installations, and improvements of any kind located on the above-described premises are owned by and title thereto is vested in District.  All said existing structures, buildings, installations, and improvements as well as all structures, buildings, installations, and improvements placed on the above-described premises by Tenant subsequent to the commencement date of the term of this Permit shall at the option of District be removed by Tenant at Tenant's expense within thirty (30) days after the expiration of the term of this Permit or sooner termination thereof.  District may exercise said option as to any or all of the structures, buildings, installations, and improvements, either before or after the expiration or sooner termination of this Permit.  If District exercises such option and Tenant fails to remove such structures, buildings, installations, and improvements within said thirty (30) days, the District shall have the right to have such structures, buildings, installations, and improvements removed at the expense of Tenant.  As to any or all structures, buildings, installations, and improvements owned by Tenant for which District does not exercise said option for removal, title thereto shall vest in District, without cost to District and without payment to Tenant.

Machines, appliances, equipment, and trade fixtures of any kind placed on the above-described premises by Tenant are owned by and title thereto is vested in Tenant and shall be removed by Tenant within thirty (30) days after the expiration of the term of this Permit or sooner termination thereof; provided, however, Tenant agrees to repair any and all damage occasioned by the removal thereof.  If any such machines, appliances, equipment, and trade fixtures are not removed within thirty (30) days after the termination of this Permit, the same may be considered abandoned and shall thereupon become the property of District without cost to the District and without payment to Tenant, except that District shall have the right to have the same removed at the expense of Tenant.

During any period of time employed by Tenant under this paragraph to remove structures, buildings, installations, improvements, machines, appliances, equipment and trade fixtures, Tenant shall continue to pay the full rental to District in accordance with this Permit which said rental shall be prorated daily.

4

8. **REMOVAL OF MATERIALS:** Tenant hereby agrees that upon the expiration of this Permit or the sooner termination as herein provided, it will remove within thirty (30) days all ships, vessels, barges, hulls, debris, surplus, and salvage materials from the land area and water area forming a part of or adjacent to the above-described premises, so as to leave the same in as good condition as when first occupied by Tenant, subject to reasonable wear and tear; provided, however, that if any said ships, vessels, barges, hulls, debris, surplus, and salvage materials shall not be so removed within thirty (30) days by Tenant, District may remove, sell, or destroy the same at the expense of Tenant; and Tenant hereby agrees to pay District the cost of such removal, sale, or destruction; or at the option of District, the title to said ships, vessels, barges, hulls, debris, surplus, and salvage materials not removed shall become the property of District.

During any period of time employed by Tenant under this paragraph to remove ships, vessels, barges, hulls, debris, surplus and salvage materials, or test for and/or remediate Contaminants as required in this Permit, Tenant shall continue to pay the full rental to District in accordance with this Permit which said rental shall be prorated daily.

9. **TERMINATION:** This Permit may be terminated by Executive Director of District or his duly authorized representative or Tenant as a matter of right and without cause at any time upon the giving of thirty (30) days' notice in writing to the other party of such termination.

10. **HOLD HARMLESS:** Tenant shall to the fullest extent permitted by law, defend, indemnify and hold harmless District and its officers, employees, and agents for any and all liability, claims, judgments, or demands arising directly or indirectly out of the obligations undertaken in connection with this Permit except claims or litigation arising through the sole active negligence or willful misconduct of District. It is the intent of this paragraph that Tenant indemnify and hold harmless District for any actions of Tenant or District except for those arising out of the sole active negligence or willful misconduct of District, including, but not limited to, claims based upon District's alleged breach of any statutory duty or obligation or Tenant's duty under contracts with third parties. This indemnity obligation shall apply for the entire time that any third party can make a claim against or sue District for liabilities arising out of Tenant's provision of services under this Permit.

11. **INSURANCE:** Tenant shall maintain "OCCURRENCE" form Commercial General Liability Insurance covering premises and operations in the amount of not less than Two Million Dollars ($2,000,000) combined single limit per occurrence for bodily injury, personal injury and property damage suffered or alleged to be suffered by any person or persons whatsoever resulting directly or indirectly from any act or activities of Tenant, of any person acting for it or under its control or direction, or any person authorized by it to use the rented premises. Either the general aggregate limit shall apply separately to this location or the general aggregate limit shall be twice the required occurrence limit.

5

All required insurance shall be in force the first day of the term of this Permit. All insurance companies must be satisfactory to District, and the cost of all required insurance shall be borne by Tenant. Certificates in a form acceptable to District evidencing the existence of the necessary insurance policies, and original endorsements effecting coverage required by this clause, shall be kept on file with District during the entire term of this Permit. Certificates for each insurance policy are to be signed by a person authorized by that insurer to issue evidence of coverage on its behalf. Endorsements for each insurance policy are to be signed by a person authorized by that insurer to bind coverage on its behalf. The District reserves the right to require complete, certified copies of all required policies at any time.

All liability insurance policies will name, or be endorsed to name, District, its officers, officials and employees as additional insureds and protect District, its officers, officials and employees against any legal costs in defending claims. All insurance policies will be endorsed to state that coverage will not be suspended, voided, canceled, reduced in coverage or in limits except after thirty (30) days' prior written notice by certified mail, return receipt requested has been given to the District. And, all insurance policies will be endorsed to state that Tenant's insurance is primary and not excess or contributing to any insurance issued in the name of District.

Any deductibles or self-insured retentions must be declared and acceptable to the District. At the option of the District, either: the insurer shall reduce or eliminate such deductibles or self-insured retentions as respects the District, its officers, officials, and employees; or, the Tenant shall procure a bond guaranteeing payment of losses and related investigations, claim administration and defense expenses.

District shall retain the right at any time to review the coverage, form, and amount of the insurance required hereby. If, in the opinion of District, the insurance provisions in this Permit do not provide adequate protection for District and/or for members of the public, District may require Tenant to obtain insurance sufficient in coverage, form and amount to provide adequate protection. District's requirements shall be reasonable but shall be designed to assure protection from and against the kind and extent of risk which exist at the time a change in insurance is required.

District shall notify Tenant in writing of changes in the insurance requirements and, if Tenant does not deposit certificates evidencing acceptable insurance policies with District incorporating such changes within sixty (60) days of receipt of such notice, this Permit shall be in default without further notice to Tenant, and District shall be entitled to all legal remedies.

The procuring of such required policies of insurance shall not be construed to limit Tenant's liability hereunder, nor to fulfill the indemnification provisions and requirements of this Permit. Notwithstanding said policies of insurance, Tenant shall be obligated for the full and total amount of any damage, injury, or loss caused by negligence or neglect connected with this Permit or with the use or occupancy of the rented premises.

12.    TAXES AND UTILITIES:  This Permit may result in a taxable possessory interest and be subject to the payment of property taxes. Tenant agrees to and shall pay before delinquency all taxes and assessments of any kind assessed or levied upon Tenant or the above-described premises by reason of this Permit or of any buildings, machines, or other improvements of any nature whatsoever erected, installed, or maintained by Tenant or by reason of the business or other activities of Tenant upon or in connection with the above-described premises. Tenant shall also pay any fees imposed by law for licenses or permits for any business or activities of Tenant upon the above-described premises or under this Permit, and shall pay before delinquency any and all charges for utilities at or on the above-described premises.

13.    CONFORMANCE WITH RULES AND REGULATIONS:  In all activities on or in connection with the premises and in all uses thereof, including activities and uses relating to aviation, Tenant shall abide by and conform to all provisions of the San Diego Unified Port District Act; any ordinances of the city in which the above-described premises are located, including the Building Code thereof; any ordinances, rules, and regulations of District; and any applicable laws of the State of California or Federal Government; as any of the same now exist or may hereafter be adopted or amended.

District shall not be liable to Tenant for any diminution or deprivation of its rights hereunder on account of any such laws, ordinances, statutes, rules, regulations, orders, limitations, restrictions, or prohibitions. In the event, however, that any such laws, ordinances, statutes, rules, regulations, orders, limitations, restrictions, or prohibitions shall so interfere with the conduct of Tenant's activities and business operations under this Permit by operation of law in accordance with the laws of the State of California, Tenant shall have the right to terminate this Permit by giving thirty (30) days' notice in writing of such termination. Such termination, however, shall not relieve the Tenant of any of its obligations and duties arising out of this Permit during Tenant's use and occupancy of the premises, including without limitation its responsibility and liability regarding hazardous substances and wastes, and its obligation to defend, indemnify and hold the District harmless as provided in this Permit.

14.    POLICY OF DISTRICT:  It is the policy of District that prevailing wage rates shall be paid all persons who are employed by Tenant on the property of District.

7

15.   **DEFAULT:** If any default be made in the payment of the rental herein provided or in the fulfillment of any terms, covenants, or conditions hereof, and said default is not cured within ten (10) days after written notice thereof, this Permit shall immediately terminate and Tenant shall have no further rights hereunder and shall immediately remove from said premises; and District shall immediately thereupon, without recourse to the courts, have the right to reenter and take possession of said premises. District shall further have all other rights and remedies as provided by law, including without limitation the right to recover damages from Tenant in the amount necessary to compensate District for all the detriment proximately caused by Tenant's failure to perform its obligations under this Permit or which in the ordinary course of things would be likely to result therefrom.

16.   **LIENS:** Tenant agrees that it will at all times save District free and harmless and defend and indemnify it against all claims and liens for labor, services or materials in connection with improvements, repairs, or alterations on the premises caused to be performed by Tenant, and the costs of defending against such claims, including reasonable attorney's fees.

17.   **BANKRUPTCY:** In the event Tenant commences a proceeding under Chapter XI of the Federal Bankruptcy Act, or is adjudicated bankrupt or insolvent, or a judicial sale is made of Tenant's interest under this Permit, this Permit shall at the option of District immediately terminate and all rights of Tenant hereunder shall immediately cease and terminate.

18.   **EASEMENTS:** This Permit and all rights given hereunder shall be subject to all easements and rights-of-way now existing or heretofore granted or reserved by District in, to, or over the premises for any purpose whatsoever, and shall be subject to such rights-of-way for reasonable access, sewers, pipelines, conduits, and such telephone, telegraph, light, heat, or power lines as may from time to time be determined by District to be in the best interests of the development of the tidelands.

District agrees that such easements and rights-of-way shall be so located and installed as to produce a minimum amount of interference to the business of Tenant.

19.   **TITLE OF DISTRICT:** District's title is derived from the provisions of the San Diego Unified Port District Act, Appendix 1, Harbors & Navigation Code, and is subject to the provisions of said Act. This Permit is granted subject to the terms and conditions of said Act.

20.   **JOINT AND SEVERAL LIABILITY:** If Tenant, as a party to this Permit, is a partnership or joint venture, or is comprised of more than one party or entity or a combination thereof, the obligations imposed on Tenant under this Permit shall be joint and several, and each general partner, joint venturer, party, or entity of Tenant shall be jointly and severally liable for said obligations. Furthermore, nothing contained herein shall be deemed or construed as creating a partnership or joint venture between District and Tenant or between District and any other entity or party, or cause District to be responsible in any way for the debts or obligations of Tenant, or any other party or entity.

21.   **NONDISCRIMINATION:** Tenant agrees at all times to fully comply with all laws prohibiting discrimination against any person or class of persons by reason of sex, color, race, religion, handicap or national origin. If the use provided for in this Permit allows the Tenant to offer accommodations or services to the public, such accommodations or services shall be offered by the Tenant to the public on fair and reasonable terms. In complying with all such laws, including, without limitation, the Americans With Disabilities Act of 1990, Tenant shall be solely responsible for such compliance and required programs and there shall be no allocation of any such responsibility between District and Tenant.

22.   **ENTIRE UNDERSTANDING:** This Permit contains the entire understanding of the parties, and Tenant, by accepting the same, acknowledges that there is no other written or oral understanding between the parties in respect to the above-described premises. No modification, amendment, or alteration of this Permit shall be valid unless it is in writing and signed by the parties hereto.

23.   **PEACEABLE SURRENDER:** Upon the termination of this Permit by the expiration thereof or the earlier termination as by the terms of this Permit provided, Tenant will peaceably surrender said above-described premises in as good condition, subject to normal and ordinary wear and tear resulting from the use of such premises as herein provided, as the same may be at the time Tenant takes possession thereof, and to allow District to take peaceable possession thereof.

24.   **HOLDOVER:** This Permit shall terminate without further notice at expiration of the term. Any holding over by Tenant after either expiration or termination shall not constitute a renewal or extension or give Tenant any rights in or to the premises. If Tenant, with District's consent, remains in possession of the premises after expiration or termination of the term or after the date in any notice given by District to Tenant terminating this Permit, such possession by Tenant shall be deemed to be a month-to-month tenancy terminable on thirty (30) days' notice given at any time by either party. During any such month-to-month tenancy, Tenant shall pay all rent required by this Permit; and if percentage rent is required by the Permit, it shall be paid monthly on or before the tenth (10th) day of each month.

9

All provisions of this Permit, except those pertaining to term, shall apply to the month-to-month tenancy.

25. ACCEPTANCE OF PREMISES: By signing this Permit, Tenant represents and warrants that it has independently inspected the premises and made all tests, investigations and observations necessary to satisfy itself of the condition of the premises. Tenant agrees it is relying solely on such independent inspection, tests, investigations and observations in making this Permit. Tenant also acknowledges that the premises are in the condition called for by this Permit, that District has performed all work with respect to premises and that Tenant does not hold District responsible for any defects in the premises. Tenant furthermore accepts and shall be responsible for any risk of harm to any person and property, including without limitation employees of Tenant, from any latent defects in the premises.

26. WARRANTIES-GUARANTEES: District makes no warranty, guarantee, covenant, including but not limited to covenants of title and quiet enjoyment, or averment of any nature whatsoever concerning the condition of the above-described premises, including the physical condition thereof, or any condition which may affect the above-described premises; and it is agreed that District will not be responsible for any loss or damage or costs which may be incurred by Tenant by reason of any such condition or conditions.

27. ATTORNEY'S FEES: In the event any suit is commenced to enforce, protect or establish any right or remedy of any of the terms and conditions hereof, including without limitation a summary action commenced by District under the laws of the State of California relating to the unlawful detention of property, the prevailing party shall be entitled to have and recover from the losing party reasonable attorney's fees and costs of suit.

28. HAZARDOUS MATERIALS: Tenant shall comply with all laws regarding hazardous substances, materials or wastes, or petroleum products or fraction thereof (herein collectively referred to as "Contaminants") relative to occupancy and use of the premises. Tenant shall be liable and responsible for any Contaminants arising out of the occupancy or use of the premises by Tenant. Such liability and responsibility shall include, but not be limited to, (i) removal from the premises any such Contaminants; (ii) removal from any area outside the premises, including but not limited to surface and groundwater, any such Contaminants generated as part of the operations on the premises; (iii) damages to persons, property and the premises; (iv) all claims resulting from those damages; (v) fines imposed by any governmental agency, and (vi) any other liability as provided by law. Tenant shall defend, indemnify and hold harmless the District, its officials, officers, agents, and employees from any and all such responsibilities, damages, claims, fines, liabilities, including without limitation any costs, expenses and attorney's fees therefor. District shall have a direct right of action against Tenant even if no third party has asserted a claim. Furthermore, District shall have the right to assign said indemnity.

10

If Tenant has in the past or continues to use, dispose, generate, or store Contaminants on the premises, District, or its designated representatives, at District's sole discretion, may at any time during the term of this Permit, enter upon the premises and make any inspections, tests or measurements District deems necessary in order to determine if a release of Contaminants has occurred. District shall give Tenant a minimum of twenty-four (24) hours' notice in writing prior to conducting any inspections or tests, unless, in District's sole judgment, circumstances require otherwise, and such tests shall be conducted in a manner so as to attempt to minimize any inconvenience and disruption to Tenant's operations. If such tests indicate a release of Contaminants, then District, at District's sole discretion, may require Tenant, at Tenant's sole expense, and at any time during the term of this Permit, to have tests for such Contaminants conducted by a qualified party or parties on the premises. If District has reason to believe that any Contaminants that originated from a release on the premises have contaminated any area outside the premises, including but not limited to surface and groundwater, then District, at District's sole discretion, may require Tenant, at Tenant's sole expense, and at any time during the term of this Permit, to have tests for such Contaminants conducted by a qualified party or parties on said area outside the premises.

The tests conducted by Tenant's qualified party shall include, but not be limited to, applicable comprehensive soil, emission, or groundwater sampling test or other procedures to determine any actual or possible contamination. Tenant shall expeditiously, but no longer than thirty (30) days after District's request for such tests, furnish to District the results of said tests, sampling plans, and analysis thereof identifying any Contaminants which exceed then applicable levels permitted by federal, state, or local laws. Tenant shall report such contamination to the District within seventy-two (72) hours and shall diligently proceed to identify the extent of contamination, how it will be remediated, when it will be remediated, by whom, and the cost of such remediation.

**29.   UNDERGROUND STORAGE TANKS:** In the event any underground storage tanks are located on the premises or hereinafter placed on the premises by any party during the term or extension of this Permit, Tenant shall be responsible for tank monitoring of all such underground storage tanks as required by the County of San Diego Hazardous Material Management Division (HMMD) or any other responsible agency. Tenant further agrees to take responsibility for reporting unauthorized releases to HMMD and the District within twenty-four (24) hours of such unauthorized release. Tenant will be responsible for all fees and costs related to the unauthorized release of Contaminants including but not limited to investigative, surface and groundwater cleanup, and expert and agency fees. Tenant shall maintain evidence of financial responsibility for taking corrective action and for compensating third parties for bodily injury and property damage caused by a release from the underground tank system. Tenant further agrees to be responsible for maintenance and repair of the storage tanks, obtaining tank permits, filing a business plan with HMMD or other responsible agency and for paying underground storage tank fees, permit fees, and other regulatory agency fees relating to underground storage tanks.

11

Tenant agrees to keep complete and accurate records on the premises for a period of not less than thirty-six (36) months from the applicable events, including, but not limited to permit applications, monitoring, testing, equipment installation, repairing and closure of the underground storage tanks, and any unauthorized releases of Contaminants and make such records available for District or responsible agency inspection. Tenant further agrees to include a copy of Health and Safety Code, Chapter 6.7, Section 25299, as part of any agreement between Tenant and any Operator of such underground storage tanks.

Furthermore, Tenant shall be responsible for compliance with all other laws and regulations presently existing or hereinafter enacted applicable to underground storage tanks, including without limitation any such laws and regulations which alter any of the above requirements.

30.   **ABOVEGROUND STORAGE TANKS:**  Tenant shall be responsible for any aboveground storage tanks on the premises.  Tenant shall, in accordance with this Permit and applicable laws and regulations, secure and pay for all necessary permits and approvals, prepare a spill prevention control counter measure plan and conduct periodic inspections to ensure compliance therewith, including conformance with the latest version of said laws and regulations.  In addition, Tenant shall maintain and repair said tanks and conform and comply with all other applicable laws and regulations for aboveground storage tanks, including without limitation all of the requirements of Health & Safety Code, Sections 25270 through 25170.13 as presently existing or as hereinafter amended, including without limitation conducting daily visual inspection of said tanks, allowing the San Diego Regional Water Quality Control Board, District, or responsible agency, to conduct periodic inspections and complying with valid orders of said Board, filing the required storage tank statement and payment of the fee therefor, establishing and maintaining the required monitoring program and systems, reporting spills as required, and payment of lawfully imposed penalties as provided therein and as otherwise provided by law.  Tenant shall be responsible for all costs associated with an unauthorized release from such tanks, including but not limited to, investigative, surface and groundwater cleanup, expert and agency fees.

31.   **NOTICES:**  Any notice or notices provided for by this Permit or by law to be given or served upon Tenant may be given or served by certified or registered letter addressed to Tenant at Post Office Box 85311, San Diego, California 92186-5311 and deposited in the United States mail, or may be served personally upon said Tenant or any person hereafter authorized by it in writing to receive such notice; and that any notice or notices provided for by this Permit or by law to be served upon District may be given or served by certified or registered letter addressed to Executive Director of District at the Administrative Offices of the San Diego Unified Port District, Post Office Box 120488, San Diego, California 92112-0488 and deposited in the United States mail, or may be served personally upon said Executive Director or his duly authorized representative; and that any notice or notices given or served as provided herein shall be effectual and binding for all purposes upon the parties so served.

12

**32.**   **SECTION HEADINGS:**  The section headings contained herein are for convenience in reference and are not intended to define or limit the scope of any provision hereof.

**33.**   **SIGNATURE OF PARTIES:**  It is an express condition of this Permit that said Permit shall not be complete nor effective until signed by either the Executive Director or Deputy Executive Director on behalf of District and by other party.

**Port Attorney**                                              SAN DIEGO UNIFIED PORT DISTRICT

By _____                    By _____

    **Deputy Port Attorney**                               SENIOR DIRECTOR, REAL ESTATE OPERATIONS


TELEDYNE RYAN AERONAUTICAL

By _____

    Title:  Vice President, Finance & Controller


13



CURVE DATA.
① Δ = 4°44'46", R=1,300.00'
   T = 53.87', L=107.68'
② Δ = 4°06'07", R=1,285.00'
   T = 46.02', L=92.00'
③ Δ = 3°20'49", R=1,342.00'
   T = 39.21', L= 78.39'
④ Δ = 5°12'01", R=1,331.00'
   T = 60.44', L= 120.80'

138
PARKING STALLS

DETAIL:
NO SCALE

NOTES:
1. PERMIT AREA SHOWN SHADED.
2. BEARINGS AND DISTANCES ARE "OLD TOWN".
3. CITY OF S.D. UTILITY ESMTS. SHOWN HATCHED.

VACATED BY CITY OF S.D. PER CITY
COUNCIL RES. NO. 189562, 2-14-67.

REVISED:

| | |
|---|---|
| DRAWN A.T. SANTONIL | |
| CHECKED BOURKE | |
| REVIEWED | |
| APPROVED | |
| DIRECTOR OF ENGINEERING | |

SAN DIEGO UNIFIED PORT DISTRICT
TIDELAND USE AND OCCUPANCY PERMIT
WITHIN CORPORATE LIMITS OF SAN DIEGO
**TELEDYNE RYAN AERONAUTICAL,**
A DIVISION OF TELEDYNE INDUSTRIES, INC.

DATE 27 AUGUST 1996
SCALE 1" = 200'
REF. 1017, 2670-B, 2E-7, 8

DRAWING NO.
007-032

# Allegheny Technologies

**Specialty Materials That Make Our World**

1000 Six PPG Place, Pittsburgh, PA 15222-5479
phone: 412.394.2836    fax: 412.394.2837
email: jwalton@alleghenytechnologies.com

*Jon D. Walton*
*Senior Vice President*
*Chief Legal and Administrative Officer*

October 16, 2002

**VIA FACSIMILE**                                                      (619) 686-6297

James Barwick, Assistant Director
Real Estate Development
San Diego Unified Port District
3165 Pacific Highway
San Diego, CA  92101-1128

**RECEIVED**

OCT 1 7 2002

SAN DIEGO UNIFIED
PORT DISTRICT
REAL ESTATE OPERATIONS

> Re:  **Tidelands Lease**
> **2701 North Harbor Drive, San Diego CA**

Dear Mr. Barwick:

TDY Industries, Inc. (f/k/a Teledyne Industries, Inc.) hereby tenders possession to the San Diego Unified Port District of the premises described as:

> Approximately 1,948,012 square feet of tideland area located at 2701 North Harbor Drive in the City of San Diego, CA, more particularly delineated and described on Drawing No. 008-010, dated November 15, 1995, which is attached as Exhibits "A" and "B" of document No. 35087 dated October 29, 1996.

Possession will be returned to the Port on October 31, 2002.  As of that date, TDY will no longer provide security, utilities, insurance and maintenance of the Premises.

TDY denies that rent is owed to the Port for the Premises.  In March 2001, an anticipatory breach of the Lease by the Port resulted in recission of the Permit *ab initio*.  TDY reserves all rights, claims, causes of action and defenses pertaining to the claims against or by the Port. Nothing in this letter shall be construed as an admission or waiver of any such rights, claims or defenses.

Very truly yours,

Jon D. Walton

JDW/kas

ATI: 34190

cc:   L.S. McAndrews
      J. Eggers
      M. McDade

ATI: 34190



**Allegheny Technologies**
Specialty Materials That Make Our World

1000 Six PPG Place, Pittsburgh, PA 15222-5479
phone: 412.394.2836    fax: 412.394.2837
email: jwalton@alleghenytechnologies.com

Jon D. Walton
Senior Vice President
Chief Legal and Administrative Officer

October 16, 2002

**VIA FACSIMILE**                          (619) 686-6297

James Barwick, Assistant Director
Real Estate Development
San Diego Unified Port District
3165 Pacific Highway
San Diego, CA  92101-1128

**RECEIVED**

**OCT 1 7 2002**

SAN DIEGO UNIFIED
PORT DISTRICT
REAL ESTATE OPERATIONS

Re:  Tidelands Use and Occupancy Permit
Document No. 39301, Dated November 18, 1998

Dear Mr Barwick,

TDY Industries, Inc. (f/k/a Teledyne Industries, Inc.) hereby tenders
possession to the San Diego Unified Port District of the premises described as:

Approximately 138 parking spaces adjacent to 2701 North Harbor
Drive located on District tidelands in the City of San Diego, CA,
more particularly delineated and described on Drawing No. 007-
032, revised August 27, 1996, which is attached to Document No.
38301 dated November 18, 1998.

Possession will be returned to the Port on October 31, 2002. As of that date,
TDY will no longer provide security, utilities, insurance and maintenance of the
Premises.

TDY denies that rent is owed to the Port. In March 2001, an anticipatory
breach of the Permit by the Port resulted in recission of the Permit *ab initio*. TDY
reserves all rights, claims and defenses pertaining to the claims against or by the
Port. Nothing in this letter shall be construed as an admission or waiver of any such
rights, claims or defenses.

Very truly yours,

Jon D. Walton

JDW/kas

ATT: 34183

cc:  L. S. McAndrews
     J. Eggers
     M. McDade

ATR 34153

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44**

Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should completed the form as follows:

I.(a) Plaintiffs - Defendants. Enter names (last, first, middle intitial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, gieving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved).

(c) Attorneys. Enter firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place the "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, it officers or agencies, place an X in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III. Residence (citizenship) of Principal Parties. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause.

V. Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action , in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI. Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate's decision.

VII. Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. Related Cases. This section of the JS-44 is used to reference relating pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

Date and Attorney Signature. Date and sign the civil cover sheet.
(rev. 07/89)

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

JS44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

**I (a) PLAINTIFFS**

SAN DIEGO UNIFIED PORT DISTRICT

03 JUN -9 PH 1:58

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

**DEFENDANTS** TDY INDUSTRIES, INC.; RYAN AERONAUTICAL CO.; TELEDYNE RYAN CO.; TELEDYNE RYAN AERONAUTICAL CO.; TELEDYNE INDUSTRIES, INC.; ALLEGHENY TELEDYNE, INC.; and ALLEGHENY TECHNOLOGIES, INC.

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** SAN DIEGO
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** SAN DIEGO
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

DOUGLAS M. BUTZ
BUTZ DUNN DeSANTIS & BINGHAM
101 WEST BROADWAY, SUITE 1700
SAN DIEGO, CA 92101   (619) 233-4777

**ATTORNEYS (IF KNOWN)**

'03 CV 1146 H   POR

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

- 1 U.S. Government Plaintiff
- X 3 Federal Question (U.S. Government Not a Party)
- 2 U.S. Government Defendant
- 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX** (For Diversity Cases Only) **FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | • 1 | • 1 | Incorporated or Principal Place of Business in This State | • 4 | • 4 |
| Citizen of Another State | • 2 | • 2 | Incorporated and Principal Place of Business in Another State | • 5 | • 5 |
| Citizen or Subject of a Foreign Country | • 3 | • 3 | Foreign Nation | • 6 | • 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).** COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT, as amended, 42 U.S.C. SECTION 9601, et seq.   ACTION FOR DAMAGES AND DECLARATORY RELIEF FOR ENVIRONMENTAL CONTAMINATION.   42: 6901 rs (JP)

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| | **PERSONAL INJURY** | **PERSONAL INJURY** | 610 Agriculture | 422 Appeal 28 USC 158 | 400 State Reappointment |
| • 110 Insurance | 310 Airplane | • 362 Personal Injury-Medical Malpractice | 620 Other Food & Drug | 423 Withdrawal 28 USC 157 | 410 Antitrust |
| • 120 Marine | 315 Airplane Product Liability | | 625 Drug Related Seizure of Property 21 USC881 | **PROPERTY RIGHTS** | 430 Banks and Banking |
| • 130 Miller Act | 320 Assault, Libel & Slander | • 365 Personal Injury - Product Liability | 630 Liquor Laws | 820 Copyrights | 450 Commerce/ICC Rates/etc. |
| • 140 Negotiable Instrument | 330 Federal Employers' Liability | • 368 Asbestos Personal Injury Product Liability | 640 RR & Truck | 830 Patent | 460 Deportation |
| • 150 Recovery of Overpayment & Enforcement of Judgment | 340 Marine | | 650 Airline Regs | 840 Trademark | 470 Racketeer Influenced and Corrupt Organizations |
| • 151 Medicare Act | 345 Marine Product Liability | **PERSONAL PROPERTY** | 660 Occupational Safety/Health | **SOCIAL SECURITY** | 810 Selective Service |
| • 152 Recovery of Defaulted Student Loans (Excl. Veterans) | 350 Motor Vehicle | • 370 Other Fraud | 690 Other | 861 HIA (1395ff) | 850 Securities/Commodities Exchange |
| | | • 371 Truth in Lending | **LABOR** | 862 Black Lung (923) | |
| • 153 Recovery of Overpayment of Veterans Benefits | 355 Motor Vehicle Product Liability | • 380 Other Personal Property Damage | 710 Fair Labor Standards Act | 863 DIWC/DIWW (405(g)) | 875 Customer Challenge 12 USC |
| • 160 Stockholders Suits | 360 Other Personal Injury | • 385 Property Damage Product Liability | 720 Labor/Mgmt. Relations | 864 SSID Title XVI | 891 Agricultural Acts |
| • 190 Other Contract | | | 730 Labor/Mgmt. Reporting & Disclosure Act | 865 RSI (405(g)) | 892 Economic Stabilization Act |
| • 195 Contract Product Liability | | | | **FEDERAL TAX SUITS** | |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 740 Railway Labor Act | 870 Taxes (U.S. Plaintiff or Defendant) | 893 Environmental Matters |
| • 210 Land Condemnation | 441 Voting | 510 Motions to Vacate Sentence Habeas Corpus | 790 Other Labor Litigation | 871 IRS - Third Party 26 USC 7609 | 894 Energy Allocation Act |
| • 220 Foreclosure | 442 Employment | 530 General | 791 Empl. Ret. Inc. Security Act | | 895 Freedom of Information Act |
| • 230 Rent Lease & Ejectment | 443 Housing/Accommodations | 535 Death Penalty | | | 900 Appeal of Fee Determination Under Equal Access to Justice |
| • 240 Tort to Land | 444 Welfare | 540 Mandamus & Other | | | 950 Constitutionality of State |
| • 245 Tort Product Liability | 440 Other Civil Rights | 550 Civil Rights | | | 890 Other Statutory Actions |
| • 290 All Other Real Property | | 555 Prisoner Conditions | | | |

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

- X 1 Original Proceeding
- 2 Removal from State Court
- 3 Remanded from Appellate Court
- 4 Reinstated or Reopened
- 5 Transferred from another district (specify)
- 6 Multidistrict Litigation
- 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23   DEMAND $ TBD - IN EXCESS OF $3,000,000.00   Check YES only if demanded in complaint: JURY DEMAND: X YES • NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):** JUDGE _____ Docket Number _____

DATE 6/9/2003   SIGNATURE OF ATTORNEY OF RECORD Ted Delvey for Douglas M. Butz

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

PD $150.00   6/9/03   #94656   KB